# Illinois Official Reports

## Appellate Court

*People v. Stull*, 2014 IL App (4th) 120704

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. AARON P. STULL, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-12-0704 |
| Filed | February 21, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions for three counts of predatory criminal sexual assault of a child and one count of aggravated criminal sexual abuse based on his conduct with his daughter were upheld, since the conviction for aggravated criminal sexual abuse did not violate the one-act, one-crime rule where the State differentiated between defendant's various acts and the charges before the jury, aggravated criminal sexual abuse was not a lesser-included offense of predatory criminal sexual assault, and the trial court did not err in admitting certain hearsay testimony. |
| Decision Under Review | Appeal from the Circuit Court of Sangamon County, No. 11-CF-262; the Hon. Patrick W. Kelley, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael J. Pelletier, Karen Munoz, and Colleen Morgan, all of State Appellate Defender's Office, of Springfield, for appellant.

John Milhiser, State's Attorney, of Springfield (Patrick Delfino, David J. Robinson, and Luke McNeill, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Justices Pope and Holder White concurred in the judgment and opinion.

## OPINION

¶ 1   In April 2012, a jury convicted defendant, Aaron P. Stull, of (1) three counts of predatory criminal sexual assault of a child (720 ILCS 5/12-14.1(a)(1) (West 2008)) (counts I through III) and (2) one count of aggravated criminal sexual abuse (720 ILCS 5/12-16(b) (West 2008)) (count IV). The trial court later imposed separate 15-year sentences on counts I, II, and III and a 4-year sentence on count IV, all to be served consecutively.

¶ 2   Defendant appeals, arguing that (1) his conviction for aggravated criminal sexual abuse violated the one-act, one-crime rule and (2) the trial court abused its discretion by admitting certain hearsay evidence. We disagree and affirm.

¶ 3                                    I. BACKGROUND
¶ 4                                  A. The State's Charges
¶ 5   In March 2011, the State charged defendant with (1) three counts of predatory criminal sexual assault of a child and (2) aggravated criminal sexual abuse. Specifically, the State alleged that from August 25, 2009, through May 24, 2010, defendant committed the offense of predatory criminal sexual assault of his then-six-year-old daughter, E.S., in that he (1) "placed his mouth on the sex organ of E.S." (count I), (2) "placed his penis in contact with the anus or sex organ of E.S." (count II), and (3) "placed his penis in the mouth of E.S." (count III). The State also alleged that during the same time frame, defendant committed the offense of aggravated criminal sexual abuse in that he "knowingly touched the body of E.S. for the purpose of sexual arousal or gratification" (count IV).

¶ 6                              B. The State's Written Pretrial Motion

¶ 7        In June 2011, the State filed a notice of intent to use hearsay evidence pursuant to section 115-10 of the Code of Criminal Procedure of 1963 (Criminal Procedure Code) (725 ILCS 5/115-10 (West 2010)). Specifically, the State sought a pretrial ruling on the admissibility of statements E.S. made to school officials and a forensic interviewer. At a November 2011 hearing, the following evidence was presented in support of the State's notice.

¶ 8        Carrie Russell, a special education teacher, testified that (1) E.S.'s preschool screening indicated she was cognitively delayed and (2) her hyperactivity caused concentration difficulties. In addition, E.S. did not enter preschool with certain skills common to children her age. Russell became E.S.'s "resource" teacher when E.S. entered kindergarten.

¶ 9        On May 24, 2010, a teacher brought E.S. to see Russell because E.S. had been kissing boys during the recess period. As Russell attempted to explain to E.S. why such behavior was inappropriate, E.S. interrupted and asked whether Russell wanted to know a secret. Before Russell could respond, E.S. told her, "Daddy and I have a special kiss and it's only for daddy and I[;] no one else knows." E.S. then showed Russell the special kiss by "sticking her tongue out and moving it around." E.S. added that (1) her father also kisses her private parts, gesturing with her hands to indicate her vagina and (2) she kisses her father's private parts.

¶ 10       Russell asked E.S. where the kissing occurs. E.S. responded that it occurs in her home when no one else is there, reiterating that "[i]t's a secret and no one else knows." E.S. then whispered in Russell's ear, "And my daddy puts his ding dong in my butt." Russell immediately took E.S. to see the school counselor, Terri Grieve. Russell estimated that her conversation with E.S. lasted approximately four minutes.

¶ 11       Grieve, a coordinator who provides services for "at risk" students, testified that E.S. would, on occasion, get "very agitated and angry throughout the school day," and her office provided E.S. a "safe spot." On May 24, 2010, Russell called Grieve and asked if she could bring E.S. to her office. Once there, E.S. agreed to talk to Grieve about her secret. E.S. told Grieve that she and her father had a special kiss that they do when they were home alone. Grieve prompted E.S. to tell her "a little bit more about that." As E.S. did with Russell, she showed Grieve the special kiss, adding, "[w]e touch tongues and we kiss each other's private parts like this." Grieve documented that E.S. then told her that "[w]e touch each other['] s private parts with our special kiss," and "[d]addy sticks his ding dong in my butt." During that meeting, Grieve did not ask E.S. questions, which was a method she had used in previous conversations with E.S.

¶ 12       Grieve acknowledged that E.S. had been previously removed from the playground for kissing boys and counseled that such behavior was inappropriate. Despite those previous talks, E.S. had not previously mentioned her secret. Grieve stated that during her May 24, 2010, conversation, E.S. was "excited to talk about what she was feeling." After speaking with E.S., Grieve called the Department of Children and Family Services (DCFS) and immediately thereafter documented her conversation with E.S.

¶ 13       Tracey Pearson, a forensic interviewer with the Child Advocacy Center, testified that her job consisted of interviewing children and conducting "neutral fact finding." On May 26, 2010, Pearson conducted a videotaped interview of E.S., which was prompted by a DCFS

hotline report. During the interview, E.S. described how she would watch naked cartoons with her father on the television and then perform the same acts as the cartoon characters. Those acts included father (1) kissing her on her lips, (2) licking her "woo woo," (3) sticking his "ding dong" in her butt, and (4) having her suck on his ding dong until "white stuff" came out. E.S. described that her father's "ding dong" tasted like "barf" and when "white stuff" would come out, her father would rub it "on her face and all over" with his "ding dong." E.S. stated that these acts occurred more than once and only with her father when no one else was home. E.S. then told Pearson that her father told her to not to say anything because it was their secret. (During the interview, E.S. pointed to the vagina on an anatomical drawing and identified it as a "woo woo.")

¶ 14    On May 11, 2011, almost one year later, Pearson reinterviewed E.S. based on a second hotline report, which conveyed that when the assigned DCFS caseworker visited the home E.S. shared with her biological mother, E.S. reported that C.S.–her older brother by almost three years–inflicted the sexual abuse she described in May 2010 instead of defendant. Pearson explained that the purpose of the second interview was to determine whether E.S.'s new claims were true. Pearson noted that E.S.'s biological mother was not cooperating with the police's investigation of defendant.

¶ 15    During that recorded second interview, E.S. recalled that she and Pearson had discussed "private parts" during the first interview. E.S. confirmed that everything she told Pearson during their first interview was true. Specifically, that her father had "naked" her and put his penis in her anus. (E.S. acknowledged that "penis" meant "ding dong," and she appeared to use the word "naked" as a verb in the past tense.) E.S. also described that her brother, C.S., "wiped" her, and "naked" her. E.S. illustrated that when C.S. "naked" her, he attempted to put his penis in her anus. E.S. stated C.S. learned this conduct by peeking through her father and mother's bedroom door and watching them. E.S. also showed Pearson that C.S. "wiped" her by rubbing his penis on her chest and the small of her back.

¶ 16    Defense counsel argued that E.S.'s statements were unreliable because E.S.'s identification of the perpetrator changed. Following argument, the trial court, noting that it had viewed both videotaped interviews Pearson conducted, stated, in pertinent part, as follows:

> "Your arguments may have some merit, [defense counsel], if the May 11th statement was made in close temporal proximity to May of 2010, but *** it was [made] a year later, and the fact is that [E.S.] was in the custody of her mother, who the only evidence [the court has] at this point was not cooperative with the prosecution of the case, so a certain inference is to be drawn there, but if [the court] focus[es] only on the 2010 statements, it is clear those statements surpass the standards required under 115-10 [of the Criminal Procedure Code]. The[y] are very reliable, they are spontaneous, at least the first one is, the one [to] Grieve and *** Russell, they are spontaneous, unprompted, and graphic. [E.S.] describes things that a kindergartner, first[-]grader should never know about, and those, left to themselves, would be *** reliable. The May 26 interview, having just watched that, was very well performed, it was non-leading, it was done the way it was supposed to have been done, and it was, there again, very reliable, and so taken by themselves, I think there is no question as to their reliability.

Now what [defense counsel] want[s] to do *** is say well, a year later the witness made a statement that was not the same as the statement we heard before, and perhaps that's true. As [the court] recalls from that tape [E.S.] was a totally different child on May 11th of 2011. She was agitated, unable to sit still, obviously distressed, and yet she did still maintain that [defendant] abused her, but then she also said that her brother[, C.S., who the court] believe[s] was *** two years older than [E.S.] or three?

[DEFENSE COUNSEL]: Right.

THE COURT: –sexually abused her.

Now on its face, in my experience that's absurd, but the relevant fact is that [E.S.] still maintains [defendant] abused her in the same way that he abused her in her statements of the year before, so what [the court is] going to do [in fairness] to the defense [is] to admit all of [the statements]."

¶ 17                    C. The State's Oral Motion *in Limine*

¶ 18    During a March 2012 pretrial hearing, the State informed the trial court that following discussions with defendant's counsel, it was seeking a pretrial ruling on the admissibility of hearsay testimony by Careyana Brenham, a physician who interviewed and examined E.S. shortly after her May 2010 disclosures to Russell, Grieve, and Pearson. Specifically, the State sought to admit the statements E.S. made to Brenham during their encounter pursuant to section 115-13 of the Criminal Procedure Code (725 ILCS 5/115-13 (West 2010)), which provides an exception to the prohibition against hearsay evidence for statements made by a sex-offense victim to medical personnel. Defendant objected, arguing only that Brenham should not be permitted to disclose any statements E.S. made regarding the offender's identity.

¶ 19    Following argument, the trial court granted the State's motion *in limine*.

¶ 20                    D. The Evidence Presented at Trial

¶ 21    At defendant's April 2012 trial, the parties presented the following evidence.

¶ 22                    1. *The State's Evidence*

¶ 23    Illinois State Police special agent John Yard testified that on May 26, 2010, he interviewed defendant for approximately 20 minutes. Defendant, who was then 32 years old, informed Yard that E.S., his daughter, was a very good child who was truthful, despite being a storyteller. Defendant denied that he had any sexual contact with E.S. and stated further that he "gets along very well with all of his children."

¶ 24    E.S., who was then eight years old, testified that her mother told her that her job was to get defendant out of jail by telling the truth. E.S. remembered talking to Russell regarding C.S. "wiping" her "private part in the front." E.S. could not remember Grieve. E.S. stated that her father (1) put his "ding dong" inside of her buttocks and in her mouth and (2) licked her "wee wee." When asked if E.S. could remember if her father's mouth touched any other part of her body, E.S. responded that it had "been a while and I forgot." E.S. acknowledged that her older

brother, C.S., saw what her mother and father were doing in their bedroom through a crack in the door. (The events C.S. observed were sexual in nature.) Afterward, C.S. stated, "I wanna do this and I wanna do that and I wanna do everything that dad did." E.S. also recounted a time when her mother pulled C.S. off of her when he attempted to do the same sexual things to her as father.

¶ 25        Russell testified consistently with her account at the November 2011 hearing on the State's notice of intent to use hearsay, adding that (1) she was alone with E.S. when E.S. initially told her of the secret kiss and (2) E.S. did not seem distraught or upset when she revealed that secret. Russell also testified consistently with Grieve's account at the November 2011 hearing regarding the events that occurred after E.S. disclosed her secret to Grieve.

¶ 26        Grieve also testified consistently with her account at the November 2011 hearing on the State's notice of intent to use hearsay, adding that E.S. would often describe an event in an excited manner although it was an issue that should have upset her.

¶ 27        Brenham testified that in June 2010, she examined E.S. That examination consisted of privately interviewing E.S. and then performing a physical exam. Brenham confirmed that conducting an interview before performing a physical exam was a "general practice" for physicians. Brenham's rationale for conducting private interviews with child victims was to prevent parents or caregivers from providing answers to questions posed to the child. Brenham explained that she wants a child victim "to tell me what happened, disclose if there's any pain or any other problems[,] and get that [information] from the child themselves." During the 15-minute interview, E.S. was, at first, hesitant to talk, stating only that "somebody had touched her." Brenham then showed E.S. an anatomical drawing and asked her to show her where she had been touched, which prompted the following response:

> "[E.S.] pointed to the genital area, to the anal area, and to the breasts, and then she opened up and started talking more.
>
> When pointing to the breasts, she stated that it was with a mouth and that [defendant] had sucked on her breast.
>
> When pointing to the genital area, [E.S.] stated both that she was touched with [defendant's] finger, and in doing that, she held up one finger just to indicate that and held up her first finger ***, and also I believe pointed to the hand on the diagram[,] indicating that she was touched with a hand in the genital area.
>
> On the anal area, [E.S.] pointed to the penis on the diagram and stated that–I believe she used the term *** 'weiner', and touched on her anal area pointing to that area and then also pointed to her genital area on the diagram and stated that she was touched in that area with the penis."

Brenham testified further that E.S. told her that defendant put his penis in her mouth, which caused "white stuff" to come out all over her face. E.S. did not tell anyone about defendant's conduct because defendant told E.S. that it was their secret.

¶ 28        Brenham's physical exam of E.S., which was observed by E.S.'s mother and a Child Advocacy Center representative, did not reveal sexual trauma. Brenham opined that she would not expect to find injuries unless she performed an examination immediately after the sexual

assault. E.S. told Brenham that defendant sexually assaulted her 10 times but could not provide a time frame as to when the assaults occurred. Brenham noted that E.S.'s age prevented her from knowing with any precision how many times defendant had sexually assaulted her.

¶ 29 Pearson testified about the method and manner in which she conducted her May 26, 2010, and May 11, 2011, recorded interviews of E.S., and her testimony was consistent with her previous account at the November 2011 hearing on the State's notice of intent to use hearsay. Videotaped recordings of both of Pearson's interviews with E.S. were played for the jury.

¶ 30 2. *Defendant's Evidence*

¶ 31 Rebecca Patton testified that in May 2011, she conducted a home visit at the residence E.S. shared with her mother, paternal grandmother, and twin brothers. Patton spoke privately to E.S., who was upset that she could not see her father. During that conversation, E.S. told Patton that "[i]t was [C.S.] who did that stuff to me anyway." When Patton asked what "that stuff" meant, E.S. responded that C.S. "stuck his ding dong in my butt." Patton then asked E.S. if her mother told her to say that. E.S. responded, "Well, yeah, because that's really what happened. [C.S.] really did that stuff." After that exchange, Patton followed DCFS protocols and ended her inquiry into E.S.'s new claim. Patton explained that because she was not qualified to conduct the type of investigative interview required when such an allegation is made, she did not want to "taint" the inevitable investigation into E.S.'s new allegations.

¶ 32 Patton's report, which she filed contemporaneous to her May 2011 interview, stated E.S. revealed that "it was not her dad that did these things." Patton testified, however, that she was merely reciting the narrative provided by the worker who authored the second hotline report. Patton confirmed that during her May 2011 conversation, E.S. did not contradict her May 2010 allegations against her father by stating "it was not her dad that did these things." (The author of the DCFS hotline report did not testify at trial; the record does not reveal who reported E.S.'s allegations concerning C.S. to the DCFS hotline.)

¶ 33 Patton had spoken privately with E.S. approximately 12 times before her May 2011 conversation and noted that E.S. had not previously mentioned that C.S.–whom Patton described as an 11-year-old, petite child–had sexually assaulted her. Patton conveyed that E.S.'s mother and grandmother expressed doubts about the accuracy of E.S.'s claims in E.S.'s presence. On one occasion, E.S.'s mother called Patton to inform her that she believed C.S. had inflicted the sexual abuse after seeing C.S. commit sexual acts with E.S.

¶ 34 Defendant testified that in May 2010, he lived in a residence with his wife, mother, and three children, which included E.S. and C.S. At that time, defendant was unemployed due to an injury he sustained while working. Defendant eventually became depressed, withdrawn, and "didn't want to face reality." Defendant left the daily child-rearing responsibilities to his mother, while he and his wife remained in their bedroom playing video games.

¶ 35 Defendant acknowledged that he and his wife engaged in "nontraditional" sex and unbeknownst to him, his children were able to see their encounters through a defective bedroom door. Defendant denied having any sexual contact with E.S., stating he had "very limited interaction" with E.S. despite her desire to spend time with him.

¶ 36                            3. *The Jury's Verdict*

¶ 37    Following argument, the jury found defendant guilty of all four counts. The trial court later sentenced defendant as previously noted.

¶ 38    This appeal followed.


¶ 39                              II. ANALYSIS

¶ 40                  A. Defendant's One-Act, One-Crime Claim

¶ 41    Defendant argues that his conviction for aggravated criminal sexual abuse violated the one-act, one-crime rule. We disagree.

¶ 42    In *People v. King*, 66 Ill. 2d 551, 566, 363 N.E.2d 838, 844 (1977), the supreme court held that a criminal defendant may not be convicted of multiple offenses when those offenses are all based on precisely the same physical act. In *People v. Rodriguez*, 169 Ill. 2d 183, 186, 661 N.E.2d 305, 306-07 (1996), the court reaffirmed and clarified the one-act, one-crime rule announced in *King* as follows:

"Under *King*, a court first determines whether a defendant's conduct consisted of separate acts or a single physical act. Multiple convictions are improper if they are based on precisely the same physical act. [Citations.] If the court determines that the defendant committed multiple acts, the court then goes on to determine whether any of the offenses are lesser[-]included offenses. [Citations.] If so, then, under *King*, multiple convictions are improper; if not, then multiple convictions may be entered."

¶ 43    We review *de novo* the issue of whether there was a violation of the one-act, one-crime rule. *People v. Millsap*, 2012 IL App (4th) 110668, ¶ 17, 979 N.E.2d 1030.


¶ 44                   1. *The State's Prosecution of Defendant*

¶ 45    In support of his argument, defendant cites *People v. Crespo*, 203 Ill. 2d 335, 788 N.E.2d 1117 (2001), asserting that the State's failure to differentiate his various criminal acts among the separate charges before the jury violated the one-act, one crime rule. Defendant's reliance on *Crespo*, however, is misplaced.

¶ 46    In *Crespo*, 203 Ill. 2d at 338, 788 N.E.2d at 1119, the defendant stabbed his girlfriend's daughter three times before stabbing his girlfriend to death. A jury convicted the defendant of (1) first degree murder, (2) armed violence, (3) aggravated battery based on intentionally or knowingly causing great bodily harm, and (4) aggravated battery premised on using a deadly weapon. *Id.* at 337, 788 N.E.2d at 1118. The trial court later sentenced the defendant to 75 years for murder, 30 years for armed violence, and 5 years for aggravated battery after merging the two aggravated battery convictions. *Id.* The defendant appealed, arguing, in part, that his conviction for aggravated battery should be vacated because it originated from the same physical act as his conviction for armed violence. *Id.*

¶ 47    The *Crespo* court first defined an "act" as "any *** outward manifestation that will support a separate offense." *Id.* at 341, 788 N.E.2d at 1120 (citing *King*, 66 Ill. 2d at 566, 363 N.E.2d at

- 8 -

844-45). Relying on its interpretation of the term "act" in *People v. Dixon*, 91 Ill. 2d 346, 356, 438 N.E.2d 180, 185 (1982), the *Crespo* court held that "separate blows, although closely related, constituted separate acts which could properly support multiple convictions with concurrent sentences." *Crespo*, 203 Ill. 2d at 342, 788 N.E.2d at 1121.

¶ 48 The supreme court concluded, however, that with regard to the three stab wounds the defendant inflicted upon the daughter, which were the subject of the armed violence and aggravated battery charges (great bodily harm), the State did not differentiate between those three separate acts, but instead charged the defendant with "the same conduct under different theories of criminal culpability." *Id*. The court also found that the State's theory at trial, as shown by its closing argument to the jury, supported its conclusion that the State intended to portray the defendant's attack of the daughter as a single criminal act. *Id.* at 344, 788 N.E.2d at 1122. The *Crespo* court held that a charging instrument must indicate that the State intended to treat the defendant's conduct as multiple acts in order for multiple convictions to stand. *Id.* at 345, 788 N.E.2d at 1123. Because the State failed to do so, the supreme court (1) did not permit the State to change its theory of the case on appeal and (2) reversed the defendant's aggravated battery conviction. *Id*. at 345-46, 788 N.E.2d at 1123.

¶ 49 Despite defendant's reliance on *Crespo*, that case does not support his position. The record before us shows that the State intended to treat his criminal conduct as multiple acts in that the State neither charged defendant for the same criminal act under multiple theories nor argued to the jury its intent to do so.

¶ 50 In this case, the State charged defendant with four separate criminal counts. Three of those counts were predatory criminal sexual assault of a child in that he committed specific acts of sexual penetration against E.S. In particular, that he (1) placed his mouth on the sex organ of E.S. (count I), (2) placed his penis in contact with the anus or sex organ of E.S. (count II), and (3) placed his penis in the mouth of E.S. (count III). Count IV, which is the subject of defendant's one-act, one-crime claim, charged defendant with aggravated criminal sexual abuse in that defendant "knowingly touched the body of E.S. for the purpose of sexual arousal or gratification." Indeed, in his brief to this court, defendant acknowledges that the State "alleged multiple instances of sexual conduct on various separate occasions."

¶ 51 The evidence the State presented to show the "acts" the defendant committed to support those four separate charges showed that defendant (1) placed his mouth on E.S.'s vagina, (2) placed his penis in contact with E.S.'s anus, (3) placed his penis in E.S.'s mouth, (4) placed his mouth on E.S.'s breasts, (5) kissed E.S. on her mouth, (6) had E.S. kiss his penis, (7) placed his finger on E.S.'s genital area, and (8) placed his hand on E.S.'s genital area.

¶ 52 Defendant asserts that because "there [was] no way of knowing whether the jury based [his] conviction for aggravated criminal sexual abuse on the allegations of kissing, breast-to-mouth contact, or instead on the same penis-to-vagina, penis-to-anus, or penis-to-mouth contact alleged in the predatory criminal sexual assault charges," his aggravated criminal sexual abuse conviction must be vacated. However, *Crespo* addressed the manner in which the State conducted its prosecution of the defendant and not the jury's consideration of the relevant evidence presented to convict the defendant of the offenses charged. See *id.* at 345, 788 N.E.2d at 1123 ("Today's decision merely holds that in cases such

as the one at bar, the indictment must indicate that the State intended to treat the conduct of defendant as multiple acts in order for multiple convictions to be sustained.").

¶ 53 Here, the record belies defendant's contention that the State failed to differentiate his various criminal acts among the separate charges before the jury. During closing arguments, the State informed the jury of the three separate propositions that it had to find the State proved beyond a reasonable doubt before the jury could return a guilty verdict for each count of predatory criminal sexual assault of a child. First, that defendant knowingly committed an act of sexual penetration with E.S.–that is, he (1) placed his mouth on the sex organ of E.S. (count I), (2) placed his penis in contact with the anus or sex organ of E.S. (count II), and (3) placed his penis in the mouth of E.S. (count III). The remaining two propositions concerned age–that is, the jury was also required to find beyond a reasonable doubt that defendant was at least 17 years old and E.S. was less than 13 years old when defendant committed the acts charged. Noting age was not in dispute, the State informed the jury, "[s]o that's what you will be focusing on is whether the acts of sexual penetration have been proved as that [term is] defined."

¶ 54 The State then continued its closing argument, as follows:

"Okay, there's one other charge though and that is a charge of what is called Aggravated Criminal Sexual Abuse, and that's a kind of sexual touching that is basically short of penetration. That's what we call sexual conduct.

Let me read you the definition of sexual conduct. 'Sexual conduct' means any intentional or knowing touching or fondling by the accused either directly or through the clothing of any part of the body of a child under 13 years of age for the purpose of the sexual gratification or arousal of the victim or the accused.

So, if you find that, for example, the [d]efendant sucked on the child's boobs such as she described them, if you find that there's evidence in the case, that's sexual conduct. If you find that the [d]efendant engaged in French kissing which was described in some of the testimony, that's sexual conduct, not sexual penetration. It involves both mouths, but that doesn't make it sexual penetration, okay, but that's sexual conduct.

To determine that one charge–it is only one charge of Aggravated Criminal Sexual Abuse. So, that would be any kind of sexual conduct that you find occurred."

¶ 55 Having concluded that defendant committed multiple offenses that the State charged and argued, we now turn to whether the offense of aggravated criminal sexual abuse is a lesser-included offense of predatory criminal sexual assault of a child.

¶ 56                                    2. *Defendant's Lesser-Included Offense Claim*

¶ 57 Defendant contends that, as charged, aggravated criminal sexual abuse is a lesser-included offense of predatory criminal sexual assault of a child. Given the record before us, we disagree.

¶ 58 Section 12-14.1(a)(1) of the Criminal Code of 1961 (Criminal Code), provides as follows:

"§ 12-14.1. Predatory criminal sexual assault of a child.

(a) The accused commits predatory criminal sexual assault of a child if:

- 10 -

(1) The accused was 17 years of age or over and commits an act of sexual penetration with a victim who was under 13 years of age when the act was committed[.]" 720 ILCS 5/12-14.1(a)(1) (West 2008).

" 'Sexual penetration' means any contact, however slight, between the sex organ or anus of one person by an object, the sex organ, mouth[,] or anus of another person ***." 720 ILCS 5/12-12(f) (West 2008).

¶ 59 Section 12-16(b) of the Criminal Code, provides, as follows:

"§ 12-16. Aggravated Criminal Sexual Abuse.

* * *

(b) The accused commits aggravated criminal sexual abuse if he or she commits an act of sexual conduct with a victim who was under 18 years of age when the act was committed and the accused was a family member." 720 ILCS 5/12-16(b) (West 2008).

" 'Sexual conduct' means any intentional or knowing touching or fondling by the victim or the accused, either directly or through clothing, of the sex organs, anus or breast of the victim or the accused, or any part of the body of a child under 13 years of age *** for the purpose of sexual gratification or arousal of the victim or the accused." 720 ILCS 5/12-12(e) (West 2008). " 'Family member' means a parent, grandparent, or child, whether by whole blood, half-blood[,] or adoption and includes a step-grandparent, step-parent, or step-child." 720 ILCS 5/12-12(c) (West 2008).

¶ 60 In *People v. Kolton*, 219 Ill. 2d 353, 356, 848 N.E.2d 950, 952 (2006), the State charged the defendant with a single count of predatory criminal sexual assault of a child. Following a bench trial, the trial court found that the State failed to meet its burden of proof on that offense, but did meet its burden of proof on the lesser-included offense of aggravated criminal sexual abuse. *Id*. The defendant appealed, arguing that (1) aggravated criminal sexual abuse is not the lesser-included offense of predatory criminal sexual assault of a child and (2) the court erred by finding him guilty of a an uncharged crime. *Id.* at 357, 848 N.E.2d at 952. The appellate court affirmed the defendant's conviction. *Id*.

¶ 61 After granting the defendant's petition for leave to appeal, the supreme court noted that "[t]he first step when deciding whether a defendant has been properly convicted of an uncharged offense is determining whether the offense is 'included' in the offense that was charged." *Id.* at 360, 848 N.E.2d at 954. To make that determination, the court employed the "charging-instrument approach," which considers "the allegations in the charging instrument to see whether the description of the greater offense contains a 'broad foundation' or 'main outline' of the lesser offense." *Id.* at 361, 848 N.E.2d at 954-55. The court concluded that the uncharged offense of aggravated criminal sexual abuse was a lesser-included offense of predatory criminal sexual assault of a child because (1) the type of sexual penetration the State alleged in its indictment encompassed the element of sexual conduct, and (2) it could be reasonably inferred that the sexual conduct that the defendant engaged in was for his sexual gratification. *Id.* at 371, 848 N.E.2d at 960.

- 11 -

¶ 62     Defendant contends that, as in *Kolton*, the State did not charge him with aggravated sexual abuse with any specificity other than alleging he committed an act of sexual conduct when he touched E.S. Specifically, defendant asserts that the "acts of 'sexual penetration' alleged in the State's predatory criminal sexual assault indictment contained the main outline of that same 'sexual conduct' or 'touching.' " We conclude that *Kolton* is inapplicable to the facts of this case because, contrary to defendant's claim, the State charged him with one count of aggravated criminal sexual abuse in addition to three counts of predatory criminal sexual assault of a child, which requires a different lesser-included offense analysis.

¶ 63     In *People v. Miller*, 238 Ill. 2d 161, 173, 938 N.E.2d 498, 505 (2010), the supreme court held that "[t]he justifications for using the charging[-]instrument approach with respect to uncharged offenses–the importance of providing notice to the parties of what offenses a defendant may be convicted of based on the particular facts of the crime and what instructions may be sought–have no applicability when dealing with charged offenses." Instead, when the State charges multiple offenses and a defendant alleges a one-act, one-crime violation, the "abstract elements approach" controls, which the court explained, as follows:

        "Under the abstract elements approach, a comparison is made of the statutory elements of the two offenses. If all of the elements of one offense are included within a second offense and the first offense contains no element not included in the second offense, the first offense is deemed a lesser-included offense of the second. [Citations.] Although this approach is the most clearly stated and the easiest to apply [citation], it is the strictest approach in the sense that it is formulaic and rigid, and considers 'solely theoretical or practical impossibility.' In other words, it must be impossible to commit the greater offense without necessarily committing the lesser offense." *Id.* at 166, 938 N.E.2d at 502.

¶ 64     Applying the abstract elements approach to this case, it is obvious that the offense of aggravated criminal sexual abuse is not a lesser-included offense of predatory criminal sexual assault of a child. Predatory criminal sexual assault of a child requires the element of sexual penetration as that term is defined, whereas aggravated criminal sexual abuse does not. In addition, the accused need not be a family member to commit the offense of predatory criminal sexual assault of a child, which is an element of the offense of aggravated criminal sexual abuse. In other words, it is possible to commit the offense of predatory criminal sexual assault of a child without necessarily committing the offense of aggravated criminal sexual abuse.

¶ 65     Accordingly, we reject defendant's argument that his conviction for aggravated criminal sexual abuse violates the one-act, one-crime rule.

¶ 66                              B. Defendant's Evidentiary Claims

¶ 67     Defendant's remaining claims concern the trial court's evidentiary rulings. Specifically, defendant argues that the court abused its discretion by admitting (1) hearsay testimony from a physician who solicited the victim's statements for prosecutorial purposes instead of treatment, (2) hearsay testimony from school officials and a forensic interviewer, and (3) E.S.'s out-of-court statements, which (a) were unnecessarily cumulative and prejudicial and

(b) violated the rule against prior consistent statements. We consider defendant's arguments in turn.

¶ 68 A trial court's evidentiary rulings will not be disturbed on review absent an abuse of discretion. *People v. Jackson*, 232 Ill. 2d 246, 265, 903 N.E.2d 388, 398 (2009). " 'A trial court will not be found to have abused its discretion with respect to an evidentiary ruling unless it can be said that no reasonable man would take the view adopted by the court.' " *Id.* (quoting *In re Leona W.*, 228 Ill. 2d 439, 460, 888 N.E.2d 72, 83 (2008)).

¶ 69                                1. *Defendant's Hearsay Claims*
¶ 70                       a. The Trial Court's Admission of E.S.'s Statements to Brenham

¶ 71 Defendant argues that the trial court abused its discretion by admitting hearsay testimony from a physician who solicited the victim's statements for prosecutorial purposes instead of treatment. Specifically, defendant contends that Brenham's testimony regarding statements E.S. made during the interview did not fall under the hearsay exception of section 115-13 of the Criminal Procedure Code. We disagree.

¶ 72 Section 115-13 of the Criminal Procedure Code provides, as follows:

"In a prosecution for violation of Section *** 12-14.1 *** or 12-16 of the [Criminal Code] ***, statements made by the victim to medical personnel for purposes of medical diagnosis or treatment including descriptions of the cause of symptom, pain or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment shall be admitted as an exception to the hearsay rule." 725 ILCS 5/115-13 (West 2010).

¶ 73 In *People v. Rushing*, 192 Ill. App. 3d 444, 452-53, 548 N.E.2d 788, 793 (1989), this court addressed the defendant's argument that the then-newly added section 115-13 of the Criminal Procedure Code was not applicable because the victim's statements to the examining physician, claiming that the defendant had sexually assaulted her, were not relevant to diagnosis and treatment. See Pub. Act 85-767, § 1 (eff. Jan. 1, 1988) (adding 725 ILCS 5/115-13). Specifically, we rejected the defendant's challenge to the victim's (1) identification of the defendant as her assailant and (2) statement–as testified to by the examining physician–that the defendant would kill the victim's parents if the victim told anyone about his sexual contact. *Rushing*, 192 Ill. App. 3d at 453, 548 N.E.2d at 793-94. In so concluding, we provided the following rationale:

"All the statements were relevant in determining the approximate time of the alleged act and *** the credibility of [the victim]. These are all matters which would reasonably be considered and relied upon by medical personnel in making any diagnosis or conclusion as to a patient's condition and proper course of treatment. Thus, the statements were also admissible under section 115-13." *Id.* at 453, 548 N.E.2d at 794.

¶ 74 A year later, citing *Rushing*, this court held that "section 115-13 of the [Criminal Procedure] Code evinces a legislative intent that the phrase 'descriptions *** insofar as reasonably pertinent to diagnosis or treatment' should be liberally construed." *People v. White*,

- 13 -

198 Ill. App. 3d 641, 655, 555 N.E.2d 1241, 1250 (1990), *aff'd*, *White v. Illinois*, 502 U.S. 346 (1992). In *White*, 198 Ill. App. 3d at 656, 555 N.E.2d at 1251, we concluded that the answers the child victim provided to medical professionals, who testified that the respective questions they posed to the victim were intended to obtain a medical history to ascertain a medical diagnosis and possible treatment, met the statutory requirements of section 115-13.

¶ 75 In this case, defendant asserts that Brenham's (1) extensive questioning of E.S. regarding the sexual contacts to her body and (2) testimony that E.S. identified defendant as the person who perpetrated that sexual assault and abuse "was not reasonably pertinent to E.S.'s diagnosis or treatment" but instead, "geared toward[ ] discovering evidence about the alleged offense." However, in *People v. Falaster*, 173 Ill. 2d 220, 222, 670 N.E.2d 624, 626 (1996), the supreme court considered and rejected the same arguments defendant raises in this appeal and did so along the same lines as our decision in *Rushing*.

¶ 76 In *Falaster*, a jury convicted the defendant of two counts of aggravated criminal sexual assault, one count of criminal sexual assault, and one count of distribution of harmful material. *Id.* The appellate court affirmed, and the supreme court later allowed the defendant's petition for leave to appeal. *Id.*

¶ 77 The pertinent issue on appeal in *Falaster* concerned the medical history a registered nurse obtained from the then-14-year-old victim–prior to a physical exam–in which the minor reported that she had been sexually abused by the defendant, her father, since she was eight years old. *Id.* at 223, 670 N.E.2d at 626. As in the instant case, the defendant in *Falaster* argued that the nurse's examination was merely "a means of developing evidence for use in a subsequent prosecution." *Id.* at 229, 670 N.E.2d at 629. The supreme court disagreed, rejecting the defendant's contention that the diagnostic purpose of the examination would be incompatible with its investigatory function. *Id*. See Michael H. Graham, Graham's Handbook of Illinois Evidence § 803.4, at 876 (10th ed. 2010) ("[A]n investigation function on the part of the person to whom the statement is made is not incompatible with a diagnostic purpose being present as well.").

¶ 78 The supreme court also considered and rejected the defendant's argument that section 115-13 did not authorize a nurse to testify to the victim's identification of the offender because the identification was irrelevant to the victim's diagnosis and treatment. *Falaster*, 173 Ill. 2d at 230, 670 N.E.2d at 629. The court noted that "at least in the family setting, a victim's identification of a family member as the offender is closely related to the victim's diagnosis and treatment in cases involving allegations of sexual abuse." *Id*. In this regard, the court quoted, approvingly, the following rationale:

"[C]hild abuse involves more than physical injury; the physician must be attentive to treating the emotional and psychological injuries which accompany this crime. [Citations.] The exact nature and extent of the psychological problems which ensue from child abuse often depend on the identity of the abuser." (Internal quotation marks omitted.) *Id.* (quoting *United States v. Renville*, 779 F.2d 430, 437 (8th Cir. 1985)).

¶ 79 In the 25 years since this court's decision in *Rushing*, Illinois courts have liberally construed the hearsay evidence admissible under section 115-13 in accord with the legislature's intent. See Graham, *supra*, § 803.4, at 876 (collecting cases for the proposition

that "[s]ection 115-13 and [now Illinois Rule of Evidence 803(4)(B) (Ill. R. Evid. 803(4)(B) (eff. Jan. 1, 2011))] are to be liberally construed in accordance with legislative intent to encompass all statements of a sexual abuse victim *** that are reasonably pertinent to diagnosis or treatment, including the identity of the perpetrator").

¶ 80    In this case, Brenham testified that she employed a structured approach to assess E.S.'s account of her sexual abuse allegations by posing open-ended questions that E.S. answered, as she best could, for the purpose of determining subsequent treatment. In this regard, defendant asserts that Brenham did not ask E.S. to describe any pain or injuries that might have been inflicted but, instead, asked her to describe with particularity how she was abused and why she delayed in disclosing the abuse. However, as the supreme court held in *Falaster*, physical injuries are not the sole issue for medical diagnosis and treatment given that, as in this case, the sexual assault and abuse was perpetrated by E.S.'s biological father, which could result in latent and long-term emotional and psychological trauma.

¶ 81    Accordingly, we reject defendant's argument and conclude that the trial court did not abuse its discretion by admitting Brenham's hearsay testimony under section 115-13 of the Criminal Procedure Code.

¶ 82                    b. The Trial Court's Admission of E.S.'s Statements
                              to Russell, Grieve, and Pearson

¶ 83    Defendant also argues that the trial court abused its discretion by admitting hearsay testimony from school officials and a forensic interviewer. We disagree.

¶ 84    As previously noted, in June 2011, the State filed a notice of intent to use hearsay evidence pursuant to section 115-10 of the Criminal Procedure Code, seeking a pretrial ruling on the admissibility of statements E.S. made to Russell, Grieve, and Pearson. Section 115-10 permits the admission of testimony of an out-of-court statement made by a victim–who is less than 13 years old–concerning a sexual offense, as the State has charged in this case. 725 ILCS 5/115-10(a)(1), (2) (West 2010). Specifically, section 115-10(b) of the Criminal Procedure Code provides that certain evidence shall be admitted as an exception to the prohibition against hearsay evidence only under the following circumstances:

    "(1) The court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability; and

        (2) The child *** either:

            (A) testifies at the proceeding; or

            (B) is unavailable as a witness and there is corroborative evidence of the act

        which is the subject of the statement[.]" 725 ILCS 5/115-10(b) (West 2010).

¶ 85    Under our deferential standard of review, we evaluate the trial court's finding that hearsay statements are sufficiently reliable for admission under section 115-10 of the Criminal Procedure Code by considering the totality of the circumstances surrounding the making of the statements at issue. *People v. West*, 158 Ill. 2d 155, 164, 632 N.E.2d 1004, 1008-09 (1994) (citing *People v. Back*, 239 Ill. App. 3d 44, 57, 605 N.E.2d 689, 699 (1992)). In so doing, we do

not focus on the evidence presented at trial, but instead, only on the evidence presented at the pretrial hearing concerning the reliability of the victim's hearsay statements. *Back*, 239 Ill. App. 3d at 57, 605 N.E.2d at 699. Factors that are important in making the determination of reliability include the following: "(1) the child's spontaneity and consistent repetition of the incident; (2) the child's mental state; (3) use of terminology unexpected of a child of similar age; and (4) the lack of motive to fabricate." *People v. Simpkins*, 297 Ill. App. 3d 668, 676, 697 N.E.2d 302, 307 (1998); *People v. Sundling*, 2012 IL App (2d) 070455-B, ¶ 31, 965 N.E.2d 563.

¶ 86    In this case, defendant renews the argument he presented at the November 2011 pretrial hearing on the State's notice of intent to use hearsay evidence–that is, the hearsay evidence presented by Russell, Grieve, and Pearson regarding E.S.'s allegations against defendant was unreliable because E.S. later recanted those claims. Contrary to defendant's contention, and as the trial court correctly noted, the specific hearsay statements the State sought to admit pursuant to section 115-10 of the Criminal Procedure Code did not show that E.S. recanted her claims against defendant.

¶ 87    At the November 2011 pretrial hearing, Pearson testified that the second hotline report, which was the reason for her second May 2011 interview with E.S., noted that E.S. stated C.S. had sexually assaulted her instead of defendant. During that second interview, however, E.S. confirmed to Pearson that the initial allegations she levied against defendant in May 2010 remained true. Instead, E.S. alleged new claims solely against her older brother, C.S. Specifically, E.S. alleged that C.S. (1) put his penis in her anus–an act E.S. stated C.S. was mimicking based on his observations of defendant–and (2) rubbed his penis on her chest and the small of her back. However, even if E.S. had recanted her allegations against defendant, we would still conclude that the trial court did not abuse its discretion by finding E.S.'s May 2010 statements to Russell, Grieve, and Pearson were reliable.

¶ 88    Here, the trial court appropriately evaluated the totality of the circumstances surrounding the making of the hearsay statements at issue. See *People v. Sharp*, 391 Ill. App. 3d 947, 955, 909 N.E.2d 971, 978 (2009) ("When conducting a section 115-10 hearing, a trial court must evaluate the totality of the circumstances surrounding the making of the hearsay statements."). Specifically, the court applied the aforementioned reliability factors and determined that, absent E.S.'s later allegations against C.S., her May 2010 statements to Russell, Grieve, and Pearson were reliable because E.S. offered them spontaneously and repeatedly regarding a subject and conduct that no six-year-old should know about.

¶ 89    The trial court then considered E.S.'s May 2011 statements to Pearson, which were made a year later while E.S. was in the custody of her mother who, as the court noted, was not cooperating with the police investigation of defendant. Although the court expressed doubt as to the reliability of E.S.'s allegations against C.S., the court nonetheless allowed the admission of the May 2011 statements E.S. made to Pearson–in fairness to defendant–to permit the trier of fact to evaluate E.S.'s later hearsay statements against C.S. in their proper context. We conclude that the court did not abuse its discretion in so ruling.

¶ 90        *2. The Trial Court's Admission of E.S.'s Out-of-Court Statements*

¶ 91        Defendant next argues that the trial court abused its discretion by admitting E.S.'s out-of-court statements because they (1) were unnecessarily cumulative and prejudicial and (2) violated the rule against prior consistent statements. We disagree.

¶ 92        a. Defendant's Cumulative and Prejudicial Claim

¶ 93        Defendant's challenge to the trial court's admission of hearsay evidence under section 115-10 by multiple witnesses as being unnecessarily cumulative and prejudicial has been addressed and consistently rejected by the appellate court. See *People v. Greenwood*, 2012 IL App (1st) 100566, ¶ 31, 971 N.E.2d 1116 (rejecting the defendant's argument that the trial court erred by admitting hearsay statements of multiple witnesses pursuant to section 115-10 and collecting cases in support of that conclusion); *People v. Lofton*, 303 Ill. App. 3d 501, 508, 708 N.E.2d 569, 574 (1999) (rejecting the defendant's argument that the trial court's admission of evidence provided by four witnesses regarding the victim's out-of-court statements was cumulative and served to bolster the State's case because section 115-10 places no limitations on the number of witnesses who may testify under its strictures); *People v. Moss*, 275 Ill. App. 3d 748, 756, 656 N.E.2d 193, 199 (1995) (declining to limit hearsay testimony admissible under section 115-10 to one witness because the statute contains no such limitation); *People v. Branch*, 158 Ill. App. 3d 338, 341, 511 N.E.2d 872, 874 (1987) (section 115-10 does not limit the number of witnesses corroborating victim's complaint to one).

¶ 94        Here, defendant acknowledges the aforementioned cases that reject the same argument he now raises. However, defendant does not otherwise attempt to distinguish his claim or argue why this court should depart from firmly established precedent. Accordingly, we adhere to our previous holdings and reject defendant's claim.

¶ 95        b. Defendant's Prior Consistent Statements Claim

¶ 96        We note that although not presented as a separate claim in his brief to this court, defendant cites the decision of the First District Appellate Court in *People v. Miller*, 302 Ill App. 3d 487, 493, 706 N.E.2d 947, 953 (1998), contending that the admission of prior consistent statements is reversible error "if the reviewing court cannot say beyond a reasonable doubt that the improperly admitted testimony did not affect the outcome of the trial." We disagree for the following reasons.

¶ 97        i. *E.S.'s Prior Consistent Statements Were Admitted as Substantive Evidence*

¶ 98        First, defendant confuses the nature of E.S.'s statements at issue in this case–admitted as substantive evidence under section 115-10 of the Criminal Procedure Code–with the type of "prior consistent statements" at issue in *Miller*, which may be admitted under limited circumstances to rehabilitate a witness's credibility.

¶ 99        "In general, proof of a prior consistent statement made by a witness is inadmissible hearsay, which may not be used to bolster a witness's testimony." *People v. House*, 377 Ill. App. 3d 9, 19, 878 N.E.2d 1171, 1179 (2007); see also *People v. Heard*, 187 Ill. 2d 36, 70, 718

N.E.2d 58, 77 (1999). However, under what we will refer to as the rehabilitative-prior-consistent-statement exception, "prior consistent statements are admissible to rebut a charge or an inference that the witness is motivated to testify falsely or that his testimony is of recent fabrication, and such evidence is admissible to show that he told the same story before the motive came into existence or before the time of the alleged fabrication." *People v. Williams*, 147 Ill. 2d 173, 227, 588 N.E.2d 983, 1003 (1991) (citing *People v. Clark*, 52 Ill. 2d 374, 389, 288 N.E.2d 363, 371 (1972)). To the extent that the term "prior consistent statement" is used as a term of art, it usually refers to a *rehabilitative* prior consistent statement admitted for this purpose. See, *e.g.*, *People v. Cuadrado*, 214 Ill. 2d 79, 90, 824 N.E.2d 214, 221 (2005); *Heard*, 187 Ill. 2d at 70, 718 N.E.2d at 77; *People v. Harris*, 123 Ill. 2d 113, 139-40, 526 N.E.2d 335, 346 (1988); *People v. Ruback*, 2013 IL App (3d) 110256, ¶¶ 26-32, 988 N.E.2d 745 (collecting cases and reviewing the common-law history of the rehabilitative-prior-consistent-statement exception to the hearsay rule). Such rehabilitative prior consistent statements are not admissible as substantive evidence.

¶ 100      The court's discussion in *People v. Watt*, 2013 IL App (2d) 120183, illustrates the distinction between a rehabilitative prior consistent statement and a substantive prior consistent statement. In *Watt*, the defendant argued on appeal that the statements the victim made in a 9-1-1 call were inadmissible *merely because* they were made prior to trial and were consistent with her testimony at trial. *Id.* ¶ 43. In rejecting that argument, the appellate court noted that the trial court had admitted the statements as *substantive* evidence under the excited utterance exception to the hearsay rule. *Id.*; Ill. R. Evid. 803(2) (eff. Jan. 1, 2011). Because the statements were admitted as substantive evidence, it was of no moment that they happened to be consistent with the witness's trial testimony. When, as in *Watt* and this case, a prior statement is offered at trial as *substantive* evidence under an exception to the hearsay rule, the mere fact that the statement is consistent with the declarant's trial testimony does not render that prior statement no longer admissible.

¶ 101      E.S.'s prior statements at issue here, introduced through the testimonies of Russell, Grieve, and Pearson, were properly admitted as substantive evidence under section 115-10 of the Criminal Procedure Code. That means that those statements could be considered substantively by the jury–that is, the jury could consider them along with all of the other evidence in the case when reaching its verdict–regardless of whether E.S. testified at trial consistently or inconsistently with those prior statements.

¶ 102                              ii. *Harmless Error*

¶ 103      Second, even if the trial court had admitted E.S.'s statements in error–that is, assuming the statements had been admitted merely to bolster E.S.'s credibility–such an evidentiary error would not warrant reversal in this case.

¶ 104      Defendant confuses the standard of review applicable to such evidentiary errors with the standard of review applicable to constitutional errors. " '[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless *beyond a reasonable doubt*.' " (Emphasis in original.) *In re E.H.*, 224 Ill. 2d 172, 180, 863 N.E.2d 231, 235 (2006) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)). However, a purely

evidentiary error–such as the one defendant alleges in this case–is harmless " 'where there is no *reasonable probability* that the jury would have acquitted the defendant absent the' error." (Emphasis in original.) *Id*. (quoting *People v. Nevitt*, 135 Ill. 2d 423, 447, 553 N.E.2d 368, 377 (1990)). Although defendant accurately cites the First District's decision in *Miller*, we disagree with that case wherein the First District applied the constitutional standard of review to the erroneous admission of prior consistent statements. See *Miller*, 302 Ill. App. 3d at 493, 706 N.E.2d at 953. Instead, the normal evidentiary standard of review should be applied to such errors. In so concluding, we reiterate what we wrote in *People v. Pelo*, 404 Ill. App. 3d 839, 865-66, 942 N.E.2d 463, 486 (2010): the harmless-error-review standard for evidentiary issues is the " 'reasonable probability' " standard, whereas the harmless-error-review standard for constitutional issues is the " 'beyond a reasonable doubt' " standard. Claims that the trial court improperly admitted a prior consistent statement do not raise a constitutional issue.

¶ 105    Under the standard of review applicable to purely evidentiary errors, the erroneous admission of prior consistent statements would seldom warrant reversal. Absent a charge of recent fabrication or a motive to lie, a jury would place little significance on the fact that a witness said the same thing twice–that is, that the witness gave a prior statement consistent with the witness's trial testimony. Indeed, a witness's doing so would be the jury's natural expectation. In other words, the erroneous admission of such statements should rarely result in any meaningful prejudice to a defendant.

¶ 106    Our analysis does not suggest, however, that trial courts should allow parties to freely introduce prior consistent statements simply to bolster their witness's credibility. We are mindful that such a tactic may, in the minds of the jury, "enhance unfairly a witness's credibility simply because the statement was repeated." Graham, *supra*, § 801.12. Trial courts should prevent parties from using prior consistent statements for this improper purpose. However, a court's error in admitting prior consistent statements will warrant reversal of the defendant's conviction only when a reasonable probability exists that the jury would have acquitted the defendant in the absence of the improperly admitted prior consistent statements. See *In re E.H.*, 224 Ill. 2d at 180, 863 N.E.2d at 235. Thus, even if E.S.'s prior consistent statements were admitted in error in this case–and we conclude they were not–the error would not have warranted reversal because the jury would have reached the same result based on E.S.'s trial testimony alone.

¶ 107                                    III. CONCLUSION
¶ 108    For the reasons stated, we affirm the trial court's judgment. As part of our judgment, we award the State its $50 statutory assessment against defendant as costs of this appeal.

¶ 109    Affirmed.