2021 IL App (2d) 200759-U
No. 2-20-0759
Order filed December 20, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 19-CF-784 |
| TAREQ AHMAD ALHMDAN, | ) ) ) | Honorable Brendan A. Maher, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE ZENOFF delivered the judgment of the court.
Presiding Justice Bridges and Justice Hutchinson concurred in the judgment.

**ORDER**

¶ 1    *Held*:  There was no error where (1) defendant's trial counsel did not perform a deficient investigation, (2) the victim's prior consistent statements were properly admitted pursuant to a hearsay exception, (3) the State proved that defendant committed two distinct acts of "sexual penetration," and (4) there was no one act, one crime violation. Therefore, we affirm.

¶ 2    Following a jury trial, defendant, Tareq Ahmad Alhmdan, was convicted of two counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(1) (West 2016)), one count of unlawful restraint (720 ILCS 5/10-3(a) (West 2016)), and one count of battery (720 ILCS 5/12-3(a)(2) (West 2016)).

The court sentenced defendant to a total of nine years in prison. Defendant appeals. For the following reasons, we affirm.

¶ 3                                          I. BACKGROUND

¶ 4        In the early morning hours of September 30, 2017, L.S. and her friend Melanie Nash-Jones[1] went to a bar in Rockford. They met some men there and decided to accompany them to defendant's residence. Neither L.S. nor Nash-Jones previously knew defendant or any of the other individuals who were at the residence. L.S. and defendant had a sexual encounter. L.S. claimed that she was raped, whereas defendant claimed that their activity was consensual. The State charged defendant with three counts of criminal sexual assault, unlawful restraint, and battery. The criminal sexual assault charges involved contact between defendant's penis and L.S.'s mouth (count I), contact between defendant's penis and L.S.'s sex organ (count II), and defendant inserting his penis into L.S.'s vagina (count III).

¶ 5        The matter proceeded to a jury trial. Defendant relied on the assistance of an Arabic interpreter at trial.

¶ 6                                          A. The State's Case

¶ 7        We begin by summarizing the testimony provided by L.S. and Nash-Jones. We will then briefly mention the testimony of other State witnesses who were involved in the investigation and L.S.'s medical treatment.

¶ 8                                              1. *L.S.*

_____

[1] Nash-Jones had a different last name at the time of trial than she did in September 2017, given her intervening marriage. For purposes of this appeal, we will use the name that she provided at trial.

¶ 9    L.S. testified, in relevant portion, as follows. Before going to defendant's residence on September 30, 2017, she and Nash-Jones agreed on a word that they would use to alert each other of any trouble: "pineapples." At the residence, L.S. spoke with defendant. Defendant led her by the hand and showed her the upstairs of the residence, including a bedroom. Defendant tried to grab her hand to stay in the bedroom, but she pulled away and went downstairs. While downstairs, L.S. saw Nash-Jones and told her that it was time to go. Nash-Jones, however, was on her phone and went into a bathroom and shut the door. Defendant then grabbed L.S.'s hand in a "leading manner" and directed her back upstairs. L.S. pulled back, but other men in the apartment blocked the stairs so that she could not go back downstairs.

¶ 10    L.S. testified that defendant led her into an upstairs bedroom and shut the door. He pushed her onto a mattress that was on the floor. She grabbed her phone and sent messages to Nash-Jones imploring "pineapples" and "please help me." Nash-Jones did not respond. Defendant took L.S.'s phone and keys away from her. L.S. had her legs crossed, and defendant pulled her leggings until she heard a ripping sound. Her legs were on the floor and her upper body was on the mattress. This position caused her severe pain in her back because she has scoliosis. Defendant removed her pants and took off his own clothes.

¶ 11    According to L.S., defendant then tried to "shove" his penis into her vagina. He was initially unsuccessful at penetrating her because she was not "wet." This made defendant mad, so he spit on L.S.'s "private parts" and "kept trying" to insert his penis. Defendant then tried to make L.S. perform oral sex on him. He touched his penis to L.S.'s mouth, but she turned away so that he could not insert it into her mouth. She told him "no" and "stop" and asked if she could go home. Defendant responded: "this is your home now." Defendant grabbed L.S.'s hair and shook her. He asked her to kiss him, but she would not do so. This, along with L.S.'s refusal to say that she liked

sex, made defendant angry.

¶ 12    L.S. testified that defendant then penetrated her vagina with his penis for "[a]while." He kept asking her if she liked it. She stayed silent, wanting it to be over. Defendant asked L.S. if he could ejaculate inside of her. She said no. He ejaculated on her stomach. He then left the bed to go to the bathroom. L.S. grabbed her phone, keys, and an earring that had fallen off. She used the earring to scrape some of the semen off her stomach. She put her clothes on and went downstairs as quickly as she could.

¶ 13    According to L.S., once downstairs, she banged on the bathroom door and told Nash-Jones "let's go." L.S. was crying and upset, but she could not immediately tell Nash-Jones why.  When L.S. and Nash-Jones got into their car to leave, defendant approached L.S.'s car and asked where she was going. L.S. responded that she had to pick up her mother. Defendant offered to drive her, saying something like "your mom is my mom now." Defendant also tried to get L.S. to drink water, telling her that she was "a little drunk." L.S. and Nash-Jones ultimately left the residence.

¶ 14    Shortly thereafter, L.S. told Nash-Jones about the sexual assault. L.S. later told her mother. L.S. then called the police around 9 a.m. that same morning to make a report. Police officers collected L.S.'s clothing and advised her to go to the hospital, which she did. L.S. submitted to a sexual assault kit. She then assisted police officers in their investigation, which ultimately led to defendant's arrest.

¶ 15    On cross-examination, L.S. explained that defendant did not grab her the first time that they went upstairs, though he did the second time. As they went up the stairs the second time, L.S. struggled against defendant so hard that she almost fell. She kept saying "no" as she was being pulled upstairs, and there were people blocking the stairs.

¶ 16    As to the sexual activity, on cross-examination, L.S. testified that she heard a ripping sound

as defendant pulled off her leggings. When she put her clothes back on, she noticed a few strings "[a]round the band" of the leggings. L.S. testified that she yelled "no" during the sexual assault and that defendant yelled back at her. As she was screaming, people downstairs turned up the music until it was extremely loud. L.S. additionally described defendant pulling her hair, slapping her face, and slapping her breast.

¶ 17                                    2. *Nash-Jones*

¶ 18     Although Nash-Jones did not witness the alleged sexual assault, she corroborated L.S.'s testimony on many points regarding the events of September 30, 2017. However, Nash-Jones's testimony diverged from L.S.'s testimony as to whether defendant pulled or otherwise forced L.S. up the stairs. Nash-Jones testified that she saw L.S. speak with both defendant and somebody named "Obood" before the alleged sexual assault. Nash-Jones later saw L.S. "heading upstairs" with defendant, and L.S. had "a little smirk" on her face.

¶ 19     On cross-examination, defense counsel inquired further as to whether L.S. voluntarily went upstairs with defendant. Defense counsel asked Nash-Jones whether, before L.S. and defendant went upstairs, L.S. whispered to Nash-Jones that defendant wanted to go upstairs. Nash-Jones answered in the negative. Defense counsel then confronted Nash-Jones with her prior written statement to a police officer. Nash-Jones acknowledged that, if her statement said the L.S. grabbed on to Nash-Jones and whispered that defendant wanted L.S. to go upstairs with him, that would be accurate. Nash-Jones then testified that she told L.S. that she "wouldn't do it" if she were L.S. Nash-Jones further testified that she mouthed "what are you doing?" to L.S. as L.S. went upstairs with defendant. L.S. then looked at Nash-Jones and smirked.

¶ 20                    3. *The Investigation and Medical Treatment*

¶ 21     Kyle Olsta of the Rockford Police Department took the initial report from L.S. on

September 30, 2017. He collected clothing from L.S. before advising her to go to the hospital. Olsta did not recall seeing rips or tears in L.S.'s clothing.

¶ 22    Alyssa Hawkins, a nurse at OSF St. Anthony Medical Center, treated L.S. in the emergency department on September 30, 2017. Hawkins testified, without objection from the defense, about what L.S. related to her about some of the details of the sexual assault and the events leading up to it. Although L.S. reported to Hawkins experiencing pain and tenderness, Hawkins examined L.S.'s body and did not notice bruises.

¶ 23    Dr. Prakriti Shah, an emergency room physician, also treated L.S. on September 30, 2017. Without objection from the defense, Dr. Shah briefly described what L.S. related to her about the sexual assault and the events leading up to it. Dr. Shah testified that L.S. reported tenderness but had no bruises, contusions, or scratches. Dr. Shah explained that L.S. had dark skin and that one's skin tone and body size could impact the visibility of marks and bruising.

¶ 24    Detective Allen Semenchuk of the Rockford Police Department conducted the follow-up investigation of L.S.'s report of sexual assault. Semenchuk first met with defendant on April 30, 2018, at which time defendant requested an Arabic interpreter. The department's Arabic interpreter was unavailable, so Semenchuk told defendant in English what the investigation entailed. Semenchuk told defendant that L.S. accused defendant of raping her. Defendant asked what that meant. Semenchuk explained the concept of rape as that defendant "had sex with her when she didn't want him to." Defendant responded: "[N]o, I didn't. No sex." Defendant then told Semenchuk that he was engaged and showed Semenchuk a picture of his fiancé.

¶ 25    According to Semenchuk, he had another discussion with defendant on April 2, 2019, this time with the assistance of an Arabic interpreter. Defendant said that he was "being accused of sleeping her [*sic*] and didn't."

¶ 26    Dexter McElhiney, a forensic scientist, testified that sperm recovered from L.S.'s person on September 30, 2017, matched defendant's profile.

¶ 27                              B. Defendant's Testimony

¶ 28    Before defendant's testimony, the court allowed defense counsel to question defendant about the current whereabouts of his friends who were at the house party on September 30, 2017. Defense counsel intended to show that these witnesses were unavailable to testify, as they were in Saudi Arabia.

¶ 29    Defendant testified that, on the night of September 29-30, 2017, he went to a bar in Rockford with Obood Badahman and Abdulla Alsharif. Defense counsel asked defendant where Alsharif was today. Defendant responded: "In Saudi Arabia." Counsel then questioned defendant about Badahman's whereabouts:

> "Q. And who is your other friend?
>
> A. Obood Badahman.
>
> Q. And where is he today?
>
> A. In Saudi Arabia.
>
> Q. We've also heard the name Obood Badahman. Do you know Obood Badahman?
>
> A. Yes.
>
> Q. And where is he today?
>
> A. He is in courtroom."

The record does not reflect whether Badahman really was in the courtroom, and the attorneys did not ask any follow-up questions on that point. The defense did not call Badahman as a witness.

¶ 30    Defendant testified that he had a consensual sexual encounter with L.S. He denied many of L.S.'s allegations regarding their encounter. Defendant also denied telling Semenchuk that he

did not have sex with L.S. Defendant claimed that he instead told Semenchuk that he did not rape L.S.

¶ 31    On cross-examination, defendant testified that, from June 2016 until April 2019, he attended Rockford University. He did not have an Arabic interpreter for his classes.

¶ 32                                     C. Verdict

¶ 33    The jury found defendant not guilty on count I of the indictment, which alleged criminal sexual assault by penis-to-mouth contact. The jury found defendant guilty of the remaining charges.

¶ 34                                D. Posttrial Motion

¶ 35    Defendant procured new counsel, who filed an amended postjudgment motion alleging ineffective assistance of trial counsel. Among defendant's claims were that his trial counsel "did so little investigation that he was apparently unaware that a potential witness, Obood Badahman, was present in the courtroom gallery" during trial.

¶ 36    The court held an evidentiary hearing on defendant's allegations of ineffective assistance of counsel. Defendant's trial attorney, Dennis Steeves, testified that he questioned defendant on the stand about Badahman's whereabouts to show the jury that Badahman was unavailable as a witness. Steeves did not know that defendant was going to respond that Badahman was in the courtroom. Steeves testified, however, that he "[a]bsolutely" asked defendant prior to defendant's testimony about the whereabouts of Badahman and the other people who were at the party. When questioned as to whether he asked defendant on the day of trial where these people were, Steeves explained that he and defendant discussed, through an interpreter, defendant's testimony just before he testified.

¶ 37    Defendant, on the other hand, testified that he and Steeves never discussed what questions

would be asked at trial. Defendant insisted that he did not know that Steeves was going to ask him about Badahman's whereabouts.

¶ 38    The court denied defendant's amended postjudgment motion in a comprehensive written order. As it is relevant to this appeal, the trial court found that, to the extent that Steeves's testimony conflicted with defendant's, Steeves was more credible "with respect to the subjects on which they each testified." The court also noted that there was no indication as to what Badahman's testimony would have been had he been called as a witness.

¶ 39                                              E. Sentencing

¶ 40    The court sentenced defendant to a total of nine years' imprisonment. This included four years for one count of criminal sexual assault and five years for the other count. Those sentences were to be served consecutively. Defendant also received a one-year prison sentence for unlawful restraint, which was to be served concurrently with the sentences for criminal sexual assault. The court fined defendant in connection with his battery conviction. Defendant timely appealed.

¶ 41                                              II. ANALYSIS

¶ 42            A. Ineffective Assistance of Counsel Regarding Obood Badahman

¶ 43    Defendant first argues that he received ineffective assistance of counsel because Steeves elicited a "prejudicial revelation" from defendant that Badahman was in the courtroom. According to defendant, Steeves "created an unreasonable and unacceptable risk that the jury believed that the reason [Badahman] was not called to the stand was that he would have provided testimony favorable to the State that would undermine [defendant]." The State responds that defendant failed to show either that Steeves performed deficiently or that such deficiency prejudiced the defense.

¶ 44    The governing principles are outlined in *Strickland v. Washington*, 466 U.S. 668 (1984). In reviewing a claim of ineffective assistance, we apply a "strong presumption that counsel's

conduct falls within the wide range of reasonable professional assistance," and the defendant must overcome the presumption that his counsel pursued a sound trial strategy. *Strickland*, 466 U.S. at 689. To sustain a claim of ineffective assistance, a defendant must show that his counsel's performance was deficient and that such deficiency prejudiced the defense. *Strickland*, 466 U.S. at 687. An attorney's performance is deficient where he or she made errors that were so serious that he or she "was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. A defendant establishes prejudice where "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. 687. In that respect, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

¶ 45    The parties dispute the standard of review. Citing *People v. Hale*, 2013 IL 113140, defendant proposes that we should review his claim *de novo*. The State responds that, because the trial court rejected defendant's ineffective-assistance claim on the merits, we may reverse only if the court's determination was manifestly erroneous. Contrary to what defendant asserts, *Hale* supports applying the manifest-weight-of-the-evidence standard of review. In *Hale*, our supreme court recognized that, "[i]n general, the standard of review for determining if an individual's constitutional rights have been violated is *de novo*." *Hale*, 2013 IL 113140, ¶ 15. Nevertheless, later in the opinion, the court determined that the trial court's credibility determination was "not against the manifest weight of the evidence." *Hale*, 2013 IL 113140, ¶ 24. Steeves and defendant offered conflicting testimony about their trial preparation, including the nature of their conversations regarding Badahman's whereabouts. The trial court denied defendant's amended

postjudgment motion, reasoning, in part, that Steeves was more credible than defendant. We could not reverse the court's decision without concluding that this credibility assessment was erroneous—an argument that defendant does not make. Accordingly, in accordance with *Hale*, we will apply the manifest-weight-of-the-evidence standard of review to the issue of whether Steeves's performance was deficient.

¶ 46    Defendant claims that Steeves performed an insufficient investigation. Specifically, defendant asserts that Steeves failed to interview him "to find out the identity of his friends at the party and their whereabouts at the time of trial," which led to counsel being surprised when defendant testified that Badahman was in the courtroom. We find it concerning that defendant's brief (1) fails to provide a full recitation of the relevant testimony that Steeves provided at the postjudgment hearing and (2) neglects to mention that the trial court deemed Steeves more credible than defendant.

¶ 47    Steeves testified that, prior to defendant's testimony, he "[a]bsolutely" questioned defendant about Badahman's whereabouts. Steeves explained that he asked defendant "a couple of times" whether there was anybody at the party who the defense needed to have testify, and defendant provided contact information only for a person other than Badahman. When questioned about whether he asked defendant on the day of trial "where these people were" (*i.e.*, Badahman and defendant's other friends), Steeves responded that, just before defendant testified, he and defendant discussed defendant's forthcoming testimony. Thus, although Steeves was surprised when defendant testified that Badahman was in the courtroom (after initially saying that Badahman was in Saudi Arabia), Steeves' testimony showed that the reason for the surprise was that defendant said something on the stand that was different from what he had told Steeves previously. Steeves's

testimony defeats defendant's claim of an insufficient investigation, and the trial court credited Steeves's testimony.

¶ 48    Moreover, as the State notes, immediately before defendant testified, the parties and the court discussed whether Steeves could elicit testimony from defendant that his friends who were with him on September 30, 2017, were unavailable to testify. During that discussion, Steeves told the court that Badahman was in Saudi Arabia and could not come to the United States. Defendant was present for this conversation and had the benefit of an interpreter. Nevertheless, defendant evidently did not correct Steeves's misconception. It is disingenuous for defendant to blame his counsel for the confusion as to Badahman's whereabouts when defendant failed to correct the confusion.

¶ 49    Defendant's failure to show that Steeves performed deficiently defeats the claim of ineffective assistance, so we need not consider whether defendant demonstrated prejudice. See *Strickland*, 466 U.S. at 697.

¶ 50                              B. Prior Consistent Statements

¶ 51    Defendant next argues that the State improperly elicited hearsay testimony regarding prior consistent statements that L.S. made to medical providers. Defendant adds that the State improperly used such evidence during its opening statement and closing argument. Defendant acknowledges that he forfeited this argument by failing to raise it below, but he seeks review of the issue pursuant to the first prong of the plain-error doctrine. He also argues that his trial counsel was ineffective for failing to object to the subject testimony and the prosecutor's comments.

¶ 52    The State responds that the subject testimony was admissible. According to the State, because the testimony was properly admitted as substantive evidence, the State was free to

comment on it, especially where identity was not a disputed issue at trial. The State further argues that defendant forfeited his ineffective-assistance-of-counsel claim by failing to raise it below.

¶ 53    The plain-error doctrine allows a reviewing court to address a forfeited argument where "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Birge*, 2021 IL 125644, ¶ 24. The defendant bears the burden of persuasion under either prong. *Birge*, 2021 IL 125644, ¶ 24.

¶ 54    Generally, a witness's prior consistent statements are inadmissible hearsay and cannot be used to bolster the witness's credibility. *People v. Randolph*, 2014 IL App (1st) 113624, ¶ 14. "The basis for this rule is a concern that the trier of fact is likely to unfairly enhance the credibility of a witness simply because his statement has been repeated." *Randolph*, 2014 IL App (1st) 113624, ¶ 14. There is an exception to this rule in prosecutions for criminal sexual assault. In such cases, the parties may offer "statements made by the victim to medical personnel for purposes of medical diagnoses or treatment including descriptions of the cause of symptom, pain or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." Ill. R. Evid. 803(4) (eff. Sept. 28, 2018); see also 725 ILCS 5/115-13 (West 2018).

¶ 55    Courts have "liberally construed" the hearsay evidence that is admissible pursuant to this exception. *People v. Stull*, 2014 IL App (4th) 120704, ¶ 79. Medical personnel may relate what the victim told them about the sexual assault, including "the background and cause" of the injuries and "the particulars of her assailant's conduct." *People v. Denny*, 241 Ill. App. 3d 345, 361 (1993).

Nevertheless, some courts have said that "statements describing an offender" are "beyond the scope of the exception." *People v. Kinnerson*, 2020 IL App (4th) 170650, ¶ 50; but see *People v. Falaster*, 173 Ill. 2d 220, 230 (1996) ("We believe that, at least in the family setting, a victim's identification of a family member as the offender is closely related to the victim's diagnosis and treatment in cases involving allegations of sexual abuse, and thus we agree with those decisions that have permitted the admission of such hearsay evidence.").

¶ 56    Defendant acknowledges that "[s]ome of L.S.'s statements elicited through Nurse Hawkins and Dr. Shah were used properly to show the course of L.S.'s diagnosis and treatment." Defendant also recognizes that neither Dr. Shah nor Hawkins testified that L.S. identified defendant as the perpetrator of the sexual assault. Although defendant's argument could have been clearer, he appears to take the position that any descriptive information about the perpetrator—such as that the perpetrator was a stranger whom the victim met at a bar—exceeds the scope of the hearsay exception for medical treatment.

¶ 57    Dr. Shah testified that her conversation with L.S. dictated the course of L.S.'s physical examination. Hawkins testified similarly that it was important to obtain information from L.S. about the assault so that they could treat her. Dr. Shah and Hawkins briefly related what L.S. told them about the general background leading up to the sexual assault and some details regarding the assailant's conduct. Neither Dr. Shah nor Hawkins testified that L.S. identified defendant as her assailant. To the contrary, Hawkins testified that L.S. merely claimed that she did not know the perpetrator before that night. L.S. believed that she knew the man's name but not the spelling of the name. Hawkins did not specify the name that L.S. mentioned.

¶ 58    We hold that the testimony provided by Dr. Shah and Hawkins came within the scope of the hearsay exception for medical treatment. We note that, had defendant preserved his argument,

we would review the trial court's admission of this testimony under the abuse-of-discretion standard. See *Stull*, 2014 IL App (4th) 120704, ¶ 81. Had the trial court made a ruling on this issue, we could reverse only if we concluded that no reasonable person would take the trial court's view. *Stull*, 2014 IL App (4th) 120704, ¶ 68. Defendant has not met this standard, let alone shown that the subject testimony amounted to a clear or obvious error for purposes of plain-error review.

¶ 59 Defendant cites numerous cases decrying the use of prior consistent statements to bolster a witness's credibility. But most of defendant's cases do not address the hearsay exception for medical treatment, so they are irrelevant. The two cases that defendant cites where courts found that testimony exceeded the scope of the hearsay exception for medical treatment are distinguishable. In *People v. Drake*, 2017 IL App (1st) 142882, ¶ 25, affirmed in part and reversed in part, 2019 IL 123734, the court held that the hearsay exception for medical treatment did not apply where a nurse related a statement that the victim made more than a week after he was admitted to the hospital, which obviously was after medical treatment had already commenced. In *People v. Oehrke*, 369 Ill. App. 3d 63, 70 (2006), the court held that the common-law hearsay exception for statements made for the purpose of medical treatment did not apply where the victim made a statement, after her wound had been treated, identifying her son as her attacker. Here, by contrast, L.S. made statements that dictated the course of her medical treatment, and the medical personnel did not testify that L.S. identified defendant as the perpetrator.

¶ 60 Defendant also argues that the State committed error during its opening statement and closing argument by using the testimony that Dr. Shah and Hawkins provided to emphasize that L.S. was consistent in maintaining that she was sexually assaulted by defendant. But defendant has not cited any case where a reviewing court held that the prosecution erred by commenting on evidence that was properly admitted under the hearsay exception for medical treatment. Moreover,

as the State correctly notes, where a prior statement is offered as substantive evidence pursuant to a hearsay exception, "the mere fact that the statement is consistent with the declarant's trial testimony does not render that prior statement no longer admissible." *Stull*, 2014 IL App (4th) 120704, ¶ 100. We are also cognizant that the trial court instructed the jury that opening statements and closing arguments are not evidence and that the jury should disregard any arguments that were not based on the evidence. Consequently, we hold that defendant has not met his burden to show that the State's opening statement or closing argument constituted a clear or obvious error.

¶ 61     We need not address the dispute between the parties as to whether defendant is procedurally barred from arguing that his trial counsel was ineffective for failing to raise objections. Even if defendant's ineffective-assistance claim were preserved, it would fail. See *People v. Rogers*, 2021 IL 126163, ¶ 32 (an attorney is not ineffective for failing to make a meritless objection).

¶ 62                                        C. Cumulative Error

¶ 63     Defendant next argues that the cumulative impact of the errors relating to the two preceding issues rendered the guilty verdicts unreliable and prejudiced him. This argument requires no further consideration, as we have held that there was no error.

¶ 64                                   D. Sufficiency of the Evidence

¶ 65     Defendant further argues that one of his two convictions for criminal sexual assault should be reversed based on the insufficiency of the evidence because L.S. denied penetration as to one of the acts. The State responds that the evidence showed two distinct acts of "sexual penetration," as that term is defined by law.

¶ 66     When reviewing a challenge to the sufficiency of the evidence, the question is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt." *People v. Herring*, 324 Ill. App. 3d 458, 460 (2001). We may not reverse a conviction "unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Herring*, 324 Ill. App. 3d at 460.

¶ 67    Defendant was charged with three counts of criminal sexual assault, which required the State to prove that defendant committed an act of "sexual penetration" and used "force or threat of force." 720 ILCS 5/11-1.20(a) (West 2016). Defendant was convicted of two of those counts. " 'Sexual penetration' means any contact, however slight, between the sex organ or anus of one person and an object or the sex organ, mouth, or anus of another person, or any intrusion, however slight, of any part of the body of one person or of any animal or object into the sex organ or anus of another person, including, but not limited to, cunnilingus, fellatio, or anal penetration. * * * " 720 ILCS 5/11-0.1 (West 2016). "This definition reflects a broad concept of 'sexual penetration,' " encompassing both "contact" and "intrusion." *People v. Maggette*, 195 Ill. 2d 336, 346-47 (2001). Significantly, the "contact" clause does not require proof of physical penetration. *Herring*, 324 Ill. App. 3d at 463. In this sense, the legal definition of "sexual penetration" is "contrary to the commonly understood meaning" of that term. *Herring*, 323 Ill. App. 3d at 463.

¶ 68    In count II of the indictment, the State alleged that, on or about September 30, 2017, defendant "committed an act of sexual penetration by the use of force or threat of force with [L.S.] in that he made contact between his penis and the sex organ of [L.S.]." In her testimony, L.S. described how defendant initially tried to "shove" his penis into her vagina. The prosecutor asked L.S. whether defendant was "able to penetrate" her vagina. L.S. responded: "Not at first, no," because she "could not get wet for him." According to L.S., defendant then got angry, spit on her "private parts," and "kept trying."

¶ 69     We hold that a rational jury could have determined from L.S.'s testimony that defendant's conduct described above constituted the first act of "sexual penetration." See *Herring*, 324 Ill. App. 3d at 464 (the victim's testimony that the defendant was " 'trying to stick his thing in' " was sufficient to show "sexual penetration"). Although defendant emphasizes that L.S. denied "penetration" up to this point in the encounter, a rational jury could have understood that comment to mean only that defendant had not yet physically penetrated her vagina with his penis. Contrary to what defendant agues, the jury could have reasonably concluded that defendant's penis contacted L.S.'s sex organ, not just that his penis "touched an area near" it.

¶ 70     Defendant cites cases involving contact between fingers and vaginas pursuant to the "intrusion" clause of the definition of "sexual penetration." See *Maggette*, 195 Ill. 2d 336; *People v. Guerrero*, 2018 IL App (2d) 160920; *People v. Bell*, 234 Ill. App. 3d 631 (1992). Those cases are distinguishable, as finger-to-vagina penetration pursuant to the "intrusion" clause requires different proof than penis-to-vagina penetration pursuant to the "contact" clause.

¶ 71     The State also charged and proved a second incident of "sexual penetration." Specifically, in count III of the indictment, the State alleged that, on or about September 30, 2017, defendant "committed an act of sexual penetration by the use of force or threat of force with [L.S.] in that he made inserted [*sic*] his penis into the vagina of [L.S.]." In her testimony, L.S. described how defendant—after unsuccessfully attempting to penetrate her vagina with his penis, and after she resisted his attempts to insert his penis into her mouth—eventually inserted his penis into her vagina. This plainly was an act of "sexual penetration," and defendant does not argue otherwise.

¶ 72     Accordingly, we hold that a rational trier of fact could have found that the State proved two distinct acts of "sexual penetration." Defendant does not challenge the State's proof that he used or threatened force.

¶ 73                    E. One Act, One Crime

¶ 74    Defendant's final argument is closely related to his preceding one regarding the sufficiency of the evidence. He asks us to vacate one of his convictions of criminal sexual assault pursuant to the one act, one crime doctrine. Although defendant claims that he preserved this argument by raising it below, he also frames the issue as second-prong plain error. The State denies that defendant preserved his argument, but the State addresses the substance of the issue pursuant to the plain-error doctrine. The State argues that there was no one act, one crime violation.

¶ 75    We need not decide whether defendant's argument is preserved. Case law is clear that one act, one crime issues are reviewable pursuant to the second prong of the plain-error doctrine, so we must address the merits of defendant's claim anyway. See *People v. Coats*, 2018 IL 121926, ¶ 10. Our review is *de novo*. *Stull*, 2014 IL App (4th) 120704, ¶ 43.

¶ 76    Traditionally, the one act, one crime analysis involves two steps. The first step is to "determine whether the defendant's conduct involved multiple acts or a single act." *People v. Miller*, 238 Ill. 2d 161, 165 (2010). An "act" for these purposes is " 'any overt or outward manifestation which will support a different offense.' " *Miller*, 238 Ill. 2d at 165 (quoting *People v. King*, 66 Ill. 2d 551, 566 (1977)). "Multiple convictions are improper if they are based on precisely the same physical act." *Miller*, 238 Ill. 2d at 165. For the second step of the analysis, if the defendant's conduct involved multiple acts, the court must consider whether the case involves lesser-included offenses. *Miller*, 238 Ill. 2d at 165. If so, then it is improper for the defendant to be convicted of multiple offenses. *Miller*, 238 Ill. 2d at 165.

¶ 77    We held above that the evidence showed two distinct acts of "sexual penetration"—one act relating to the contact between defendant's penis and L.S.'s sex organ, and a second act relating to defendant inserting his penis into L.S.'s vagina. In situations involving multiple acts occurring

in a short time span, defendants frequently argue that the State failed to differentiate between those acts when prosecuting the case. See, *e.g.*, *Stull*, 2014 IL App (4th) 120704, ¶ 45. Here, however, defendant does not specifically raise that argument, and the State made it clear to the jury during closing argument that it was alleging multiple distinct acts of "sexual penetration." Additionally, there is no issue of lesser-included offenses here, as counts II and III of the indictment both alleged the offense of criminal sexual assault. Accordingly, defendant's one act, one crime argument fails under the traditional analysis.

¶ 78    Defendant relies on *People v. Strawbridge*, 404 Ill. App. 3d 460 (2010). In *Strawbridge*, the defendant was convicted of multiple counts of predatory criminal sexual assault of a child. *Strawbridge*, 404 Ill. App. 3d at 461. Counts I and II of the indictment both alleged that the defendant placed his penis in the victim's vagina. *Strawbridge*, 404 Ill. App. 3d at 462. Count I alleged that such conduct occurred between June 24, 1999, and March 20, 2000, whereas count II alleged that such conduct occurred on or about March 20, 2000. *Strawbridge*, 404 Ill. App. 3d at 462. We vacated one of the defendant's convictions pursuant to the one act, one crime doctrine. We reasoned that it was "impossible to determine whether the jury found that there was one instance of penile to vaginal contact and yet found defendant guilty with regard to both counts because that instance of conduct took place between June 24, 1999, and March 20, 2000, but also happened to occur on or about March 20, 2000, or if it determined that there were multiple instances of such conduct." *Strawbridge*, 404 Ill. App. 3d at 463. In so holding, we noted that the victim "testified to an act of intercourse occurring on March 17, 2000, which is within the time periods described in both counts." *Strawbridge*, 404 Ill. App. 3d at 463.

¶ 79    *Strawbridge* is distinguishable, as it involved an ambiguity caused by overlapping time periods outlined in the charging instrument. There was no similar ambiguity here, given the State's

explanation to the jury that the various counts related to distinct acts of "sexual penetration." Defendant speculates that the jury may have believed that he committed only one act of "sexual penetration"—by inserting his penis into L.S.'s vagina as alleged in count III—yet also convicted him on count II because such conduct inherently involved contact between defendant's penis and L.S.'s sex organ. We have no reason to believe that the jury ignored the State's explanation that different counts related to distinct acts. Accordingly, unlike in *Strawbridge*, it is not "impossible to determine" whether the jury found two acts of "sexual penetration" instead of one.

¶ 80                                    III. CONCLUSION

¶ 81    For the reasons stated, we affirm the judgment of the circuit court of Winnebago County.

¶ 82    Affirmed.