2024 IL App (2d) 230548-U
No. 2-23-0548
Order filed November 19, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 22-CF-907 |
| JORGE RENDON CASTILLO, | ) ) | Honorable Alice C. Tracy, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE McLAREN delivered the judgment of the court.
Justices Hutchinson and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) The trial court did not err in admitting the child victim's prior statements describing sex offenses by defendant where the time, content, and circumstances of the statements provided sufficient safeguards of reliability.  (2) Defendant's three convictions of predatory criminal sexual assault of a child were supported by evidence that, on three separate occasions, he touched the victim's vaginal area with his hand.

¶ 2    Defendant, Jorge Rendon Castillo, appeals from his three convictions of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2020)), contending that (1) the trial court erred in admitting two out-of-court statements of the victim and (2) the State failed to prove beyond a reasonable doubt that he committed three separate acts of predatory criminal sexual assault of a

child. We affirm because the victim's statements were properly admitted and the evidence was sufficient to support the three convictions.

¶ 3                                I. BACKGROUND

¶ 4     The State indicted defendant on multiple sex offenses against his daughter, J.R., including three counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2020)) based on his rubbing J.R.'s vagina with his hand, three counts of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(1)(i) (West 2020)) based on his touching J.R.'s vagina, two counts of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(1)(i) (West 2020)) based on his touching J.R.'s breast, and one count of attempted child pornography for attempting to record on his cell phone an act of sexual conduct between himself and J.R. (720 ILCS 5/8-4(a), 11-20.1(a)(1)(i) (West 2020)). All offenses allegedly occurred between December 24, 2021, and April 17, 2022.

¶ 5     Before trial, the State sought admission of two out-of-court statements by J.R. under section 115-10 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10 (West 2020)). At the hearing on the section 115-10 motion, Kasandra Osorio, a forensic interviewer with the Kane County Child Advocacy Center (CAC), testified that on May 17, 2022, she interviewed J.R. Osorio identified both a video and transcript of the interview. Both exhibits were admitted at the hearing.

¶ 6     Osorio began by asking J.R. about her interests and family. According to J.R., her mother told her the interview was scheduled because of what defendant had done to her. J.R. had "[r]ecently" told her mom what defendant did. J.R. denied that "anyone [told] [her] *** what to say or what not to say" at the interview.

¶ 7     Osorio then asked J.R. to describe what defendant had done to her. According to J.R., when she was 11 years old, defendant "touched" her "more than one time." The first incident

occurred when she had just returned from school and gone to her bedroom. Defendant came into her bedroom and "just started like touching [her]." Osorio asked J.R. to describe the touching, but J.R. was reluctant. After attempting to reassure J.R., Osorio asked her if anyone had ever touched her "private parts." J.R. replied that, on three separate occasions at school, a girl touched J.R.'s breast over her clothes, a boy jumped on J.R.'s back and began "making like sexual noises and like humping [her]," and a boy showed her his private parts.

¶ 8    When Osorio asked J.R. again how defendant had "touched" her, she answered:

"At first like he like slapped me and then like—and then he just like started like touching my private—my private parts and then the second time it happened like he like when I got home from school like he came inside my room and he pulled out like a gun or something and I think it was like a [BB] gun *** and he liked aimed it on my head and like that's— that's all I remember from the second time."

Osorio then asked further questions about the "second time." According to J.R., after defendant pulled out the BB gun, he started "touching" her. When Osorio asked J.R. which of her private parts defendant touched, J.R. answered, "Like my breast and then like down here, that's it." J.R. stated that defendant touched her breast over her clothes. Osorio then referred back to J.R.'s statement that defendant touched her "down there" and asked if she had a name for that area. J.R. said she forgot the name but described it as "the area that [she] pee[d] from." J.R. told Osorio that defendant "reached down there and started rubbing." According to J.R., defendant rubbed under her underwear. J.R. could not remember if defendant "rubb[ed] *** on the outside" of the area that she peed from or "on the inside of that area[.]" During the incident, defendant had red eyes and alcohol on his breath. He told J.R. not to tell her mom or anyone else, or he would kill J.R. and anyone she told. He stopped touching J.R. when her mom arrived home around 3:30 p.m.

¶ 9      Osorio, noting that J.R. had just related the "second time" defendant had touched her, asked J.R. if she recalled any other incidents of touching.  J.R. said she remembered a "fourth time" defendant touched her, which was "pretty much like the same thing as the second [incident]" except that he "pulled out a knife."  Osorio asked J.R. to describe the "fourth time."  J.R. stated that she had just arrived home from school and was sitting on her bed using her phone.  Defendant walked in, threw her phone on the floor, and tried to "touch" her.  According to J.R., she tried to resist by kicking and hitting defendant.  Defendant then pulled out a knife and threatened to slice her throat or stab her if she did not let him touch her.  The knife was similar to one of the family's kitchen knives.  After defendant pulled out the knife, he "started touching [her] breast and then he started touching like—he just started like rubbing down there like under [her] clothes[.]"  He touched her breast over her clothes.  By the area "down there," she meant the part she peed from.  He rubbed that part under her clothes.  When asked if he rubbed that part on the "outside" or the "inside," she said the outside.  He stopped when her mother came home.  When Osorio asked J.R. if defendant ever rubbed her breasts under her clothes, J.R. shook her head.  When Osorio asked J.R. if she recalled any touching incidents aside from "the times that [they] talked *** about," J.R. said no.

¶ 10     When Osorio asked J.R. if defendant ever took photos of her, J.R. answered that, during the first time he touched her, he stood his cell phone on her dresser and pressed record.  She denied that he did so any other time.

¶ 11     Osorio then asked J.R. more questions about the first time that defendant touched her.  During that first incident, defendant "just started like rubbing [her] down there, that's it."  By "down there," she meant "the part that [she] use[d] to pee[.]"  He touched her on the outside of

that part. She did not recall "how [her] clothes [were] that time[.]" She denied that defendant touched her anywhere else during that first incident.

¶ 12 J.R.'s mother, J.H., also testified at the section 115-10 hearing. She testified that, during the relevant times in 2021 and 2022, she lived in a house with two apartments, one upstairs and one downstairs. She lived in the downstairs apartment.

¶ 13 J.H. testified that, on May 8, 2022, defendant entered her apartment without permission; he had previously lived there but had moved down the street. According to J.H., defendant's appearance inside the house scared her because the door was unlocked and she was unable to protect herself or her children, as she was recovering from surgery.

¶ 14 J.H. testified that, about a half-hour after defendant appeared, J.R. came into J.H.'s bedroom. J.R. was upset and crying because J.H. had argued with the upstairs neighbor for giving defendant access to the house. J.R. asked J.H. not to let defendant back into the house. After J.H. said that she also did not want defendant in the house, J.R. said that she had something to tell J.H. J.H. asked her what was wrong. J.R. said that defendant had "inappropriately touched her on several occasions." When J.H. asked J.R. where defendant had touched her, she said, "[O]n her chest and her vaginal area." When the prosecutor asked J.H. if J.R. said "how many times *** it happened," J.H. answered:

> "Originally she—I did ask her and she said she wasn't sure. She said at one point nine times, and then she said I don't remember exactly how many, ***, it was a few times. So, she wasn't a hundred percent sure. I just—specifically she said that it was more than one."

¶ 15 J.R. told J.H. that the touching always occurred in J.R.'s bedroom on her bed. J.R. could not recall exactly when the incidents occurred, but she did confirm that they occurred "before

[defendant] went to the hospital." Thus, J.H. inferred that the incidents occurred between late December 2021, when defendant moved back into the apartment, and early February 2022, when he was hospitalized for his alcohol abuse.

¶ 16 According to J.H., J.R. said that she took so long to disclose the incidents because defendant had threatened her on each occasion and she was afraid. In addition to verbal threats, defendant in some instances displayed a gun or a knife or put his arm to her throat.

¶ 17 J.H. also testified that J.R. told her that she thought defendant might have recorded the incidents with his phone. J.R. told her that defendant propped his phone up on the nightstand facing her bed, but she was unsure if he actually recorded.

¶ 18 J.H. testified that, two days after J.R.'s May 8, 2022, disclosure, she went to the Elgin Police Department and reported what J.R. had said.

¶ 19 On cross-examination, J.H. was asked what J.R. specifically said about defendant touching her chest. J.R. said that defendant "on a few occasions *** had touched her over her shirt and also he went under her shirt under her like bra touching her." About the vaginal touching, J.R. said that defendant "had touched her over her clothes and then he also put his hands inside her underwear and she felt his fingers inside her."

¶ 20 On redirect examination, J.H. testified that J.R. told her that the incidents happened after school but before J.H. got home from work.

¶ 21 The trial court granted the State's motion and admitted both J.R.'s statement to Osorio and her statement to J.H. In explaining its decision, the court considered whether the time, content, and circumstances of the two statements provided sufficient safeguards of reliability. See 725 ILCS 5/115-10(b)(1) (West 2020). The court found that J.R.'s disclosure to J.H. occurred within four months of the incidents—"[a] relatively close time frame in this type of a case." The court

also found that the disclosure was spontaneous, as there was no evidence that J.H. asked J.R. leading questions or told her what to say. The court further found that, although J.R. was upset about the possibility of defendant returning to the apartment, she had no apparent motive to fabricate. The court then compared J.R.'s two statements. The court found "consistent repetition" in that J.R. described to both J.H. and Osorio the same "[bodily] locations and the type of abuse" and said that defendant threatened her with a knife on one occasion and a gun on another. As for differences, the court acknowledged that J.R. (1) told J.H. but not Osorio that defendant penetrated her vagina with his fingers; (2) told J.H. that defendant touched her breast both over and under her clothes but told Osorio that he touched her breast only over her clothes; and (3) gave J.H. more details than Osorio on some matters. The court also found that J.R.'s terminology was age-appropriate, as she did not use the "actual correct terminology" for her vaginal area.

¶ 22     The following evidence was presented at defendant's jury trial. J.R. testified that, when she was 11 years old, she lived in a house in Elgin with her brother and J.H. She and her family lived in the downstairs apartment, and another family lived in the upstairs apartment. Between December 2021 and April 2022, defendant lived with J.R. and her family. During that period, she was in the sixth grade. She would walk home from school and arrive before J.H. arrived from work. Only defendant was home when J.R. returned. According to J.R., defendant would often be drinking in the living room when she arrived. That made her uncomfortable. Also, between December 2021 and April 2022, defendant would follow her into her bedroom and touch her in ways that made her uncomfortable. J.R. was shown an anatomical female drawing and circled the areas defendant touched. She circled the breasts and the pubic area. She had no name for the pubic area but called it the area where she would "go number one."

¶ 23    When the prosecutor asked J.R. how often defendant touched "[her] bottom part that [she] used to go number one," she answered, "More than one time." She could not recall specifically how many times he touched her in that area. Likewise, she testified that defendant touched her breasts "[o]ne or more times," but she could not recall specifically how many times.

¶ 24    Referencing the first time defendant touched her, the prosecutor asked J.R. if defendant touched her "bottom private where [she] [went] number one or on [her] breasts[.]" She replied, "My breasts." On this occasion, he touched her breasts over her clothes.

¶ 25    According to J.R., the second time defendant touched her was in "[b]oth areas," *i.e.*, "[her] bottom part that [she] used to go number one as well as [her] breasts[.]" He touched her bottom part under her clothes. As he did so, his hand was moving. He touched her breasts over her clothes. During that incident, defendant held a BB gun to her head.

¶ 26    During a third incident, defendant touched "both parts," *i.e.*, "[her] lower part that [she] used to go number one as well as [her] breasts[.]" Defendant touched her bottom area under her clothes. He touched her breasts over her clothes. His hand was moving as he touched each area. According to J.R., defendant was holding a kitchen knife during the third incident. She confirmed that defendant touched her on only the three occasions she described.

¶ 27    On cross-examination, J.R. testified that defendant lived with her family intermittently. In May 2022, J.R. often saw defendant and J.H. argue. Defendant also drank often, and J.R. did not like defendant's drinking.

¶ 28    When J.R. was asked if any incidents at school had made her uncomfortable, she testified that, when she was eight or nine years old, a boy at school jumped on her back and made sexual noises. J.R. told J.H. about the incident. On another occasion, the same boy made sexual noises

but did not touch J.R. Another time, a girl at school touched J.R.'s breasts. J.R. told her teacher and J.H. about the incident.

¶ 29 On redirect examination, J.R. explained that she did not like defendant's drinking because he would get angry with her and her brother and hit them.

¶ 30 J.H. testified that she and defendant never married but had an intermittent relationship for about 14 years. During that period, defendant and J.H. lived together at times. In December 2021, defendant moved in with J.H. in a house in Elgin. The house had two apartments, and J.H. occupied the downstairs apartment. Defendant moved out in April 2022 and began living with her aunt in the upstairs apartment. That made J.H. very uncomfortable because she would often see defendant. According to J.H., defendant was not allowed in her apartment after he moved out.

¶ 31 J.H. testified that, on May 8, 2022, she was at home recovering from a health issue. While she was lying down, defendant entered her apartment uninvited. He asked to retrieve some personal belongings that he had left there. J.H. told him that he was not welcome in her apartment. Defendant did not like J.H.'s reaction, but he left anyway.

¶ 32 After defendant left, J.R. approached and said she wanted to talk. J.R., who was crying, asked J.H. not to let defendant come back. After J.H. assured her that she would not let defendant come back, J.R. told her that defendant had touched her inappropriately. According to J.H., J.R. said that defendant had touched her "breast" and "vagina." Although J.R. could not recall the exact number of times, she told J.H. that it happened "a couple [of] times." J.R. said that the touching occurred in her bedroom. J.R. said she waited so long to tell because she was afraid that, if she said anything, defendant would hurt J.H. and everyone else in the apartment.

¶ 33    According to J.H., between December 2021 and April 2022, she worked from 7 a.m. until 3:30 p.m.  J.R. attended school from 8 a.m. to 2 p.m.  Defendant did not work in January and February 2022.

¶ 34    On cross-examination, J.H. testified that, after J.R. made her general disclosure that defendant had touched her inappropriately, she asked J.R. for specifics.  According to J.H., J.R. said that defendant had fondled her breasts both over and under her clothing.  She also told J.H. that defendant had touched her vagina both over and under her clothing.  J.H. further testified that J.R. told her that defendant had inserted his fingers into her vagina.

¶ 35    J.H. testified that her relationship with defendant was intermittent because of his "substance abuse" and "abuse in general."  Defendant's alcohol abuse caused them to argue.  Both J.R. and her brother saw the two arguing.  The "last big" argument between defendant and J.H. occurred on Easter 2022; defendant had been drinking and "decided to do his own thing and it was just being very obnoxious."

¶ 36    Osorio testified that she conducted a forensic interview of J.R. at the CAC.  Osorio identified both a video and a transcript of the interview.  Both exhibits were admitted at trial.  According to Osorio, J.R. was 12 years old when she interviewed her, and J.R. used age-appropriate language in discussing the sexual abuse.  Osorio described J.R. as very reserved, shy, and hesitant to speak.

¶ 37    The jury found defendant (1) guilty of all three counts of predatory criminal sexual assault of a child, (2) guilty of all five counts of aggravated criminal sexual abuse, and (3) not guilty of attempted child pornography.

¶ 38    Defendant filed a motion for a judgment notwithstanding the verdict or a new trial, arguing, *inter alia*, that (1) the trial court erred in admitting J.R.'s hearsay statements to J.H. and Osorio,

because they lacked sufficient safeguards of reliability; and (2) the evidence was insufficient to prove him guilty of all charges beyond a reasonable doubt. The court denied the posttrial motion and sentenced defendant to, *inter alia*, consecutive prison sentences on the three convictions for predatory criminal sexual assault of a child. After the denial of his postsentencing motion, defendant filed this timely appeal.

¶ 39                                        II. ANALYSIS

¶ 40     On appeal, defendant contends that (1) the trial court erred in admitting J.R.'s hearsay statements to J.H. and Osorio, because the State did not establish that those statements were sufficiently reliable; and (2) the State failed to prove beyond a reasonable doubt that he touched J.R.'s vagina on three separate occasions, as was required to support three separate convictions for predatory criminal sexual assault of a child as charged.

¶ 41     We first address whether the trial court abused its discretion in admitting J.R.'s hearsay statements to J.H. and Osorio. It did not.

¶ 42     Section 115-10 of the Code (725 ILCS 5/115-10 (West 2020)) provides an exception to the rule against hearsay for certain out-of-court statements made by a victim under age 13 in a child sex offense case. Under section 115-10(a)(2), admissible testimony includes "testimony of an out of court statement made by the victim describing any complaint of such act or matter or detail pertaining to any act which is an element of an offense which is the subject of a prosecution for a sexual or physical act against the victim." 725 ILCS 5/115-10(a)(2) (West 2020). The testimony may be admitted at trial only if the trial court finds at a hearing conducted outside the jury's presence that the time, content, and circumstances of the statement provide sufficient safeguards of reliability and, as relevant here, the child testifies at trial. 725 ILCS 5/115-10(b)(1), (2)(A) (West 2020). "Among the factors to be considered in making a reliability determination are (1) the

child's spontaneity and consistent repetition of the incident, (2) the child's mental state, (3) use of terminology unexpected of a child of a similar age, and (4) the lack of motive to fabricate." *People v. Cookson*, 335 Ill. App. 3d 786, 791 (2002). The trial court must evaluate the totality of the circumstances surrounding the child's hearsay statement. *People v. Burgund*, 2016 IL App (5th) 130119, ¶ 242.

¶ 43    In analyzing a trial court's ruling under section 115-10, we consider only the testimony admitted at the pretrial hearing, not the evidence at trial. *People v. Stull*, 2014 IL App (4th) 120704, ¶ 85. The State bears the burden of establishing that the statements were reliable and not the result of adult prompting or manipulation. *People v. Zwart*, 151 Ill. 2d 37, 43 (1992). A trial court has broad discretion in determining the admissibility of hearsay statements under section 115-10, and a reviewing court will not disturb the trial court's finding absent an abuse of discretion. *People v. Bowen*, 183 Ill. 2d 103, 120 (1998). An abuse of discretion occurs when the trial court's determination is arbitrary, fanciful, or unreasonable. *People v. Applewhite*, 2016 IL App (4th) 140558, ¶ 52.

¶ 44    The two statements in which J.R. disclosed defendant's improper touching were largely consistent regarding the number of incidents, their location and surrounding circumstances, and the nature of the touching. J.R. initially told J.H. that defendant had inappropriately touched her on "several occasions." When J.H. asked if she could recall specifically how many times, J.R. said "nine times," but then she backtracked, stating only that the touching happened "a few times," and "more than one" time. On the other hand, J.R. described three incidents to Osorio (specifically, she spoke of a "first," "second," and "fourth" incident, but she never described the third incident). "Three" is certainly "several," "a few," or "more than one." Further, in both statements, J.R. related that the incidents occurred on her bed in her room after she arrived home from school but

before J.H. came home from work. J.R. also disclosed to both J.H. and Osorio that defendant threatened her with a knife once and a gun another time. J.R. told J.H. of a third manner of physical threat—defendant's placing his arm against her throat—that she did not mention to Osorio. However, J.R.'s failure to include this detail did not undermine the reliability of her statements. Finally, the nature of the touching, as reported in the statements, was generally consistent. J.R. reported to both J.H. and Osorio that defendant touched her breast and the "area that [she] pee[d] from," or her vaginal area. We acknowledge that, as defendant notes, J.H.'s accounts varied in some ways. First, J.R. told J.H. that defendant touched her breasts both under and over her clothes, yet J.R. denied to Osorio that defendant touched her breasts under her clothes. Second, J.R. told J.H. that defendant inserted her fingers into her vagina, but when speaking to Osorio she either denied or could not remember whether defendant penetrated her with his fingers. Viewing the statements in their totality, and noting their consistency on major points, we cannot say that the discrepancies rendered them unreliable.

¶ 45 The spontaneity factor also does not detract from the admissibility of the statements. J.H. testified that J.R. told her the incidents occurred before defendant's February 2022 hospitalization. However, J.R. implied to Osorio that the improper touching might have occurred as late as April 2022, when defendant moved out. However, even a delay of a few months (rather than a few weeks) was understandable if, as J.R. claimed, defendant threatened to kill J.R. and anyone she told about the incidents. Also, irrespective of any delay, the timing of J.R.'s disclosure was notable, as it coincided with her suspicion that defendant was moving back into the apartment. Given the absence of any motive for J.R. to fabricate the allegations, it was certainly not unreasonable for the trial court to conclude that J.R. disclosed to protect herself from further sexual abuse. Defendant asserts that J.R. had a motive to fabricate because she disliked defendant's

drinking, but the evidence at the section 115-10 hearing, to which we are limited, made no reference to J.R.'s dislike of defendant's drinking. See *Stull*, 2014 IL App (4th) 120704, ¶ 85 (admissibility under section 115-10 is determined solely by the evidence at the motion hearing).

¶ 46 Further, nothing in J.H.'s testimony or Osorio's interview suggested that they asked J.R. leading questions or otherwise induced her to make false allegations. Likewise, J.H. and Osorio did not suggest any terminology to J.R. but allowed her to describe the events in her own way. Indeed, J.R. referenced the "area that [she] pee[d] from," rather than her "vagina." The terminology she used was age-appropriate.

¶ 47 Defendant asserts that J.R.'s mental state rendered her statements unreliable. However, there is no indication in the video of Osorio's interview, or elsewhere at the section 115-10 hearing, that J.R. suffered from any mental or emotional instability when she gave her statements. Although she appeared shy and somewhat reticent with Osorio, that is not unusual considering she was a 12-year-old child asked to report private family matters to an adult she just met. Although defendant points to victim-impact evidence at sentencing that J.R. had a fragile mental state related to several incidents at school, those matters were not before the trial court at the section 115-10 hearing. Defendant cites no authority allowing a reviewing court to consider trial or sentencing evidence in judging the admissibility of section 115-10 statements; all authority we have found restricts the reviewing court to the evidence at the motion hearing. See, *e.g.*, *Stull*, 2014 IL App (4th) 120704, ¶ 85.

¶ 48 Based upon the time, content, and circumstances of J.R.'s statements, the trial court did not abuse its discretion in finding the statements sufficiently reliable to be admitted under section 115-10.

¶ 49   We next address whether the State proved beyond a reasonable doubt three separate incidents of predatory criminal sexual assault of a child (PCSAC) as charged in the first three counts of the indictment.  It did.

¶ 50   In addressing a challenge to the sufficiency of the evidence, the reviewing court does not retry the defendant.  *People v. Milka*, 211 Ill. 2d 150, 178 (2004).  Rather, the question on appeal is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements beyond a reasonable doubt.  *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004).  This standard requires the reviewing court to draw all reasonable inferences in favor of the prosecution.  *Cunningham*, 212 Ill. 2d at 280.  A reviewing court will not overturn a guilty verdict unless the evidence is so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of the defendant's guilt.  *People v. Collins*, 214 Ill. 2d 206, 217 (2005).

¶ 51   A single witness's positive and credible testimony is sufficient to support a criminal conviction.  *People v. Smith*, 185 Ill. 2d 532, 541 (1999).  Where a conviction depends on eyewitness testimony, the reviewing court may find such testimony insufficient only where the evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt.  *Cunningham*, 212 Ill. 2d at 279-80.

¶ 52   To support a conviction of PCSAC as charged, the State had to prove that, *inter alia*, defendant "commit[ted] an act of contact, however slight, between the sex organ or anus of one person and the part of the body of another for the purpose of sexual gratification or arousal of the victim or the accused[.]"  See 720 ILCS 5/11-1.40(a)(1) (West 2020).  The three counts of PCSAC were identically worded and alleged that defendant "rubbed J.R.'s vagina with his hand."  PCSAC requires skin-to-skin contact.  *People v. Currie*, 2023 IL App (2d) 220114, ¶ 42.  Defendant does

not dispute that J.R. was referencing her "sex organ" with her informal descriptions of her pubic area; consequently, in our discussion to follow we characterize her as simply referencing her "vaginal area."

¶ 53    We must determine whether the State proved beyond a reasonable doubt that defendant touched J.R.'s vaginal area on three separate occasions as charged.  J.R. testified at trial that defendant touched her vaginal area "[m]ore than one time."  However, she could not specify the number of times.  She initially described an incident in which defendant touched her breasts only. She went on to describe two incidents in which defendant touched her vaginal area with his hand. J.H. testified at trial that J.R. told her that defendant had touched her vaginal area "a couple [of] times" but that J.R. could not recall the exact number of times.

¶ 54    However, the jury had not only the testimony of J.R. and J.H. but also Osorio's interview with J.R.  In that interview, J.R. described three incidents in which defendant touched her inappropriately.  J.R. labeled them the "first," "second," and "fourth" incidents but did not describe a third incident.  When she initially mentioned the first incident, J.R. said that defendant touched her "private parts."  Without further elaboration on the first incident, J.R. began describing the second incident.  Osorio asked questions about the second incident, and J.R. stated that defendant rubbed her vaginal area with his hand on that occasion.  J.R. then described a fourth incident and said that defendant rubbed her vaginal area with his hand on that occasion as well.  Eventually, Osorio asked again about the first incident, and J.R. stated that defendant rubbed her vaginal area with his hand that time, too.

¶ 55    Between J.R.'s trial testimony, J.H.'s trial testimony, and J.R.'s statement to Osorio, the jury heard about three different incidents in which defendant touched J.R.'s vaginal area with his hand.

¶ 56　Defendant, however, argues that J.R.'s testimony and her statement to Osorio create an irreconcilable conflict as to what occurred during the first incident of touching and, thus, give rise to a reasonable doubt that defendant touched J.R.'s vaginal area on three occasions. Defendant points out that J.R. told Osorio that he touched her vaginal area and nowhere else, while she testified at trial that defendant touched her breast and nowhere else. To the extent this creates an inconsistency, resolving it was well within the jury's province. See *Cunningham*, 212 Ill. 2d at 283. The jury might well have concluded that J.R.'s statement to Osorio was more accurate because it was given outside the stress of a trial setting.

¶ 57　Defendant also asserts that the jury evidently rejected J.R.'s description to Osorio of the first incident, since J.R. claimed that defendant attempted to record that incident with his phone, yet the jury acquitted him of the attempted child pornography charge. The jury, however, was free to find that defendant touched J.R.'s vaginal area *but* that he did not attempt to record the incident; the touching and recording were not intrinsically linked.

¶ 58　Accordingly, when viewed in the light most favorable to the State, the evidence was sufficient to prove beyond a reasonable doubt that defendant committed three separate acts of PCSAC as charged in the first three counts of the indictment. We uphold all three convictions.

¶ 59　　　　　　　　　　　　　III. CONCLUSION

¶ 60　For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 61　Affirmed.